EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Orlando Ortiz<br><br>Recurrido<br><br>v.<br><br>Holsum de Puerto Rico, Inc.<br><br>Peticionario | Certiorari<br><br>2014 TSPR 35<br><br>190 DPR ____ |

Número del Caso: CC-2013-306

Fecha: 7 de marzo de 2014

Tribunal de Apelaciones: Región Judicial de Ponce

Abogado de la Parte Peticionaria:

　　　Lcdo. José R. González Nogueras

Abogada de la Recurrida:

　　　Lcda. Nilda Seda Cuevas

Materia: Ley 59-1997 – requisitos que debe cumplir un patrono para establecer programa de detección de sustancias controladas en el lugar de trabajo; interpretación de los resultados de la prueba de detección de sustancias controladas.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Orlando Ortiz

     Recurrido

       v.

Holsum de Puerto Rico, Inc.

     Peticionario

                       CC-2013-306

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES en cuanto a los acápites I, II, III, IV y VI. En cuanto a la introducción y al acápite V, estuvieron conformes los Jueces Asociados señores MARTÍNEZ TORRES, KOLTHOFF CARABALLO, RIVERA GARCÍA Y FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 7 de marzo de 2014.

En esta ocasión tenemos la oportunidad de analizar la Ley de Prueba de Sustancias Controladas, Ley Núm. 59-1997, 29 L.P.R.A. sec. 161 et seq. En particular, debemos examinar si el patrono cumplió con ciertos requisitos exigidos por ley para establecer un programa de detención de sustancias controladas.

Asimismo, este caso nos permite reiterar un principio básico de nuestro derecho procesal apelativo: toda parte que interese recibir un Remedio a su favor, debe acudir al tribunal apelativo correspondiente a solicitarlo. Es decir,

un tribunal apelativo está impedido de otorgar un remedio a una parte que no acudió en revisión.

I

Como en este caso revisamos la denegatoria del foro primario de dictar sentencia sumaria, relataremos los hechos materiales que no están en controversia, según se recogen en la resolución del Tribunal de Primera Instancia. Apéndice, págs. 44-56.

El 8 de mayo de 1995, el Sr. Orlando Ortiz comenzó a trabajar para Holsum de Puerto Rico. Como parte de sus labores, el señor Ortiz tenía asignada una guagua de carga comercial para visitar a los clientes diariamente. En febrero de 2009, luego de varios años de trabajar en la empresa, el señor Ortiz se sometió a una prueba de drogas que resultó inconclusa porque la muestra de orina estaba diluida. Ante esa situación, se citó al señor Ortiz para que proveyera una segunda muestra de orina, pero presenciada. Esa prueba resultó negativa.

El 4 de febrero de 2010, el señor Ortiz arrojó positivo a cocaína en otra prueba de dopaje requerida por Holsum. Al señor Ortiz se le brindó la oportunidad de acudir a un centro de rehabilitación, según disponía la Ley Núm. 59, supra, y la Política sobre Posesión, Uso y Pruebas para la Detección de Sustancias Controladas y Alcohol de Holsum, Apéndice, págs. 115-128. También se le apercibió que en una segunda ocasión sería despedido.

Al año próximo, específicamente el 24 de enero de 2011, el señor Ortiz fue sometido nuevamente a una prueba de dopaje. El resultado de esa prueba fue inválido, porque el laboratorio concluyó que la muestra estaba diluida. Apéndice, págs. 173 y 180. Por esa razón, se le hizo una segunda prueba el 28 de enero de 2011, la cual arrojó un resultado negativo. Para obtener un resultado más definitivo, Holsum ordenó que el señor Ortiz se realizara una tercera prueba de dopaje el 11 de febrero de 2011, esta vez de cabello. Esta prueba arrojó un resultado positivo a cocaína. Debido a que esta fue la segunda ocasión en la que el señor Ortiz arrojó positivo a cocaína, Holsum lo despidió de su empleo.

Ante ello, el señor Ortiz presentó una demanda por despido injustificado bajo el trámite expedito que contempla la Ley Núm. 2 de 17 de octubre de 1961, 32 L.P.R.A. sec. 3118 et seq. Holsum se opuso y presentó una moción de sentencia sumaria. Adujo que no había controversia sobre el resultado de las pruebas, por lo que solicitó que se desestimara la demanda porque alegadamente el despido estaba justificado. El foro primario denegó la moción de sentencia sumaria. Determinó que la Ley Num. 59, supra, sólo permite que se hagan a los empleados dos pruebas al año. Por esa razón, concluyó lo siguiente:

> Según la evidencia presentada, el querellante fue sometido a tres pruebas de dopaje durante el 2011 [;] la primera prueba fue considerada inválida por el laboratorio por razones que no surgen con claridad del expediente, la segunda fue negativa y la tercera arrojó positivo al uso de cocaína. De probarse por

parte del patrono que el empleado fue el responsable de que la muestra tomada el 2[4] de enero de 2011 arrojase un resultado inválido… no albergamos duda en torno al hecho de que la prueba del [28] de enero de 2011 debería de considerarse, para fines de la aplicación de la Ley de Detección de Sustancias Controladas, como la primera prueba de ese año…. Sin embargo, esa es precisamente la duda que asalta la conciencia del tribunal, ante la insuficiencia de la prueba disponible en esta etapa procesal del caso.

A contrario sensu, si no llegase a demostrarse que el empleado provocó **el resultado inválido** de la muestra, **alterándola** o diluyéndola,… deberíamos de concluir que luego del resultado negativo de la segunda muestra tomada el [28] de enero de 2011 Holsum estaba impedido de someter al demandante a una prueba adicional. Apéndice, págs. 54-55. (Énfasis suplido.)

Como se aprecia, el Tribunal de Primera Instancia pareció equiparar un resultado inválido a una muestra alterada o adulterada.

Inconforme, el 1 de marzo de 2013, Holsum presentó una solicitud de certiorari ante el Tribunal de Apelaciones. Ese foro se negó a expedir el auto solicitado.

Aun en desacuerdo, Holsum presentó la petición de certiorari que nos ocupa. Señala que el Tribunal de Apelaciones erró al sostener la decisión del foro primario que presuntamente impuso a Holsum un elemento de prueba no contemplado en la Ley Núm. 59, supra, y excesivamente oneroso: demostrar que el empleado fue el responsable de que la prueba de dopaje tuviese un resultado inconcluso. Holsum también nos indica que el foro apelativo intermedio incidió al no resolver que la conducta del señor Ortiz constituía justa causa para su despido, de acuerdo con la Ley Núm. 80 de 30 de mayo de 1976, 29 L.P.R.A. 185a et seq.

El 28 de junio de 2013, ordenamos al señor Ortiz que mostrara causa por la cual no se debía revocar el dictamen del Tribunal de Apelaciones. Nuestra orden se cumplió. Con el beneficio de los argumentos de ambas partes, pasamos a resolver.

## II

La querella que nos ocupa se presentó al amparo del procedimiento sumario laboral provisto por la Ley Núm. 2, supra. Sobre el particular, resolvimos en Dávila, Rivera v. Antilles Shipping, Inc., 147 D.P.R. 483, 498 (1999), que las resoluciones interlocutorias que se tramitan al amparo de la Ley Núm. 2, supra, **no** son revisables excepto en las circunstancias siguientes: (1) cuando el foro primario haya actuado sin jurisdicción; (2) en situaciones en las que la revisión inmediata dispone del caso por completo y; (3) cuando la revisión tenga el efecto de evitar una grave injusticia. Véase, además, Aguayo Pomales v. R & G Mortg., 169 D.P.R. 36, 45 (2006). Es claro que en este caso aplica la segunda excepción ya que se nos solicita que dictemos sentencia sumaria a favor del patrono peticionario, lo que dispondría del caso por completo. Es obvio que nuestra jurisdicción no depende del resultado final del recurso. Por ende, no existe ningún impedimento procesal que nos impida atender los méritos de este recurso.

## III

**A.** Es conocido por todos que el "uso y abuso de sustancias controladas constituye un serio problema en la sociedad puertorriqueña contemporánea, de cuyas consecuencias el escenario de trabajo no está inmune". Soto v. Adm. Inst. Juveniles, 148 D.P.R. 810, 819 (1999).

Cónsono con esa realidad, la Asamblea Legislativa aprobó la Ley Núm. 59, supra. El Art. 2 de esa ley, íd., 29 L.P.R.A. sec. 161n, establece que su propósito es detectar el uso de sustancias controladas por parte de empleados y candidatos a empleo en el sector privado. Véase, además, Condado Plaza v. Asoc. Emp. Casinos P.R., 149 D.P.R. 347, 363 esc. 10 (1999). Asimismo, se pretende "promover la salud y seguridad de los trabajadores y, consecuentemente de la comunidad en general, proveyendo las salvaguardas necesarias para la protección de la intimidad e integridad personal del individuo afectado". Íd. De esa forma, la aprobación de la Ley Núm. 59, supra, supuso un esfuerzo de parte del Estado para erradicar el uso y tráfico ilegal de sustancias controladas. Alicea v. A.S.E.M., 152 D.P.R. 312, 323 esc. 9 (2000).

El Art. 5 de la Ley Núm. 59, supra, 29 L.P.R.A. sec. 161b, contiene los requisitos que debe cumplir todo patrono que desee establecer un programa de detección de sustancias controladas. En síntesis, dispone: (1) la manera en que se deben conducir las pruebas a los empleados y candidatos a empleo; (2) la necesidad de que el patrono apruebe un reglamento para la implementación del programa de detección de drogas; (3) el contenido que debe tener el reglamento que se apruebe para ese fin y; (4) quién sufragará los gastos de las pruebas realizadas.

En lo concerniente, expresa el Art. 5 de la Ley Núm. 59, supra, que "[t]odo empleado podrá ser sometido a un máximo de dos pruebas al año". Íd. Asimismo, ese artículo dispone que en la primera prueba que se haga "no habrá observador presente mientras el empleado provee la muestra". Íd. Expresa, además, que "se tomará la temperatura de la muestra en presencia del empleado sometido a la prueba, como medida para determinar si la muestra

ha sido adulterada. **"En caso de que se determine la adulteración de una muestra, ésta será descartada y se solicitará al empleado que provea una nueva**, esta vez ante la presencia de una persona de su mismo sexo…". Íd. (Énfasis suplido.)

Nótese que el reglamento que el patrono implemente deberá contener una descripción detallada de los procedimientos a seguir para realizar las pruebas. Íd. En cuanto a ese asunto, la legislación especifica **"que las pruebas se harán mediante muestra de orina, salvo circunstancias en que no sea posible"**. Íd. (Énfasis suplido.)

En el Art. 5 de la Ley Núm. 59, íd., también se dispone que las pruebas sobre las muestras se llevarán a cabo por un laboratorio certificado y se administrarán de acuerdo con los procedimientos analíticos y de cadena de custodia de muestra científicamente aceptables, de modo que se proteja al máximo la intimidad del empleado. Asimismo, el legislador dispuso que las muestras se deben administrar conforme las directrices para el programa federal de prueba de drogas en el lugar de trabajo (*Mandatory Guidelines for Federal Workplace Drug Testing Program*). Íd. (Traducción suplida.)

**B.** La Administración de Salud Mental y Abuso de Sustancias (*Substance Abuse and Mental Health Services Administration*), adscrita al Departamento de Salud y Servicios Sociales de Estados Unidos (*Department of Health and Human Services*) es la entidad encargada de publicar periódicamente las directrices para el programa federal de prueba de drogas en el lugar de trabajo (directrices federales). M. Mercado Echegaray*,* Drug Prohibition in America: Federal Drug Policy and its Consequences, 75 Rev. Jur. U.P.R. 1215, 1270 (2006). Las

primeras directrices federales se publicaron en 1988. Veáse

Mandatory Guidelines for Federal Workplace Drug Testing Program,

53 Fed. Reg. 11970 (11 de abril de 1988). Posteriormente, esas

directrices se han revisado en varias ocasiones. Véanse, 59 Fed.

Reg. 29908 (9 de junio de 1994); 62 Fed. Reg. 51118 (30 de

septiembre de 1997); 63 Fed. Reg. 63483 (13 de noviembre de

1998); 69 Fed. Reg. 19644 (13 de abril de 2004); y 73 Fed. Reg.

71858 (25 de noviembre de 2008).[1]

En lo pertinente, la Sec. 1.5 de las directrices

federales, 73 Fed. Reg. 71877-71879, define una muestra

adulterada como "un espécimen que ha sido alterado, según se

evidencie con resultados que muestren una sustancia que no es un

componente normal para ese tipo de espécimen o una concentración

anormal de una sustancia endógena".[2] Por el contrario, se

configura un resultado inválido cuando de una muestra **no** se

puede establecer un resultado positivo, negativo, adulterado o

sustituido para una droga específica o una prueba de validación

de espécimen.[3] Íd. Esas definiciones ponen de manifiesto que una

**prueba adulterada** y un **resultado inválido** no son sinónimos. En

el caso del resultado inválido no se puede concluir a ciencia

---

[1] Las guías actuales están publicadas en 73 Fed. Reg. 71858 (25 de noviembre de 2008), y entraron en vigor el 1 de octubre de 2010. Véase 75 Fed. Reg. 22809 (26 de abril de 2010).

[2] El texto original en inglés es el siguiente: "*A specimen that has been altered, as evidenced by test results showing either a substance that is not a normal constituent for that type of specimen or showing an abnormal concentration of an endogenous substance*".

[3] El texto original es el siguiente: "*The result reported by an HHS-certified laboratory ... when a positive, negative, adulterated, or substituted result cannot be established for a specific drug or specimen validity test*".

cierta si la muestra fue adulterada, o si arrojó positivo o negativo a cierta droga.

Por su parte, constituye una prueba cancelada aquel espécimen que es reportado como inválido por un médico certificado y la persona a la que se hace la muestra no puede explicar alguna razón para ello.[4] Íd. Eso puede ocurrir en situaciones en las que el espécimen dividido falla en reconfirmarse, o cuando se determina que existe un defecto fatal en el registro forense en particular. De las definiciones citadas se puede concluir que la Sección 1.5 de las directrices federales, íd., sugiere que el empleado es quien tiene que ofrecer una explicación legítima cuando una prueba produce un resultado inválido.

Por otra parte, la Sec. 2.1 de las directrices federales, 73 Fed. Reg. 71879, establece que la orina es el único espécimen que una agencia federal puede recolectar para realizar las pruebas de drogas en el lugar de trabajo. Del historial de las directrices federales surge que el propósito de esa sección era clarificar que a las agencias federales se les prohíbe recolectar cualquier otro tipo de espécimen para realizar las pruebas de drogas en el lugar de trabajo. Véase 73 Fed. Reg. 71860.

---

[4] El texto original en inglés de la definición de "prueba cancelada" es el siguiente:

*Cancelled Test. The result reported by the MRO to the Federal agency when a specimen has been reported to the MRO as invalid result (and the donor has no legitimate explanation) or rejected for testing, when a split specimen fails to reconfirm, or when the MRO determines that a fatal flaw or unrecovered correctable error exists in the forensic records (as described in Sections 15.1 and 15.2).*

La Sec. 13.5 de las directrices federales, 73 Fed. Reg. 71900-71901, contiene unas situaciones que pueden justificar la imposibilidad de recolectar una muestra de orina. Es decir, aunque según las directrices cada caso se evalúa individualmente, existen condiciones médicas que pueden impedir que se realice una muestra de orina. En particular, la Sec. 13.5 de las directrices federales, íd., dispone que una condición médica incluye:

> una condición fisiológica comprobable (por ejemplo, una disfunción del sistema urinario) o un trastorno psicológico preexistente que ha sido médicamente documentado; pero no incluye alegaciones infundadas de "ansiedad situacional" o de deshidratación. Son condiciones médicas permanentes o prolongadas, las anormalidades fisiológicas, anatómicas o psicológicas que, según se ha documentado, existían antes del intento de recolección de la muestra y que se consideran como condiciones que no habrán de corregirse o curarse en largo tiempo o, tal vez, nunca; por ejemplo, la destrucción (por cualquier causa) del sistema de filtración glomerular que conduzca a un fallo renal; la ruptura traumática y no reparada del tracto urinario o un trastorno psiquiátrico grave relacionado específicamente con el sistema genitourinario. Aunque algunas condiciones médicas agudas o temporales como cistitis, uretritis o prostatitis podrían interferir con la recolección de la muestra por un período de tiempo limitado, no se les puede brindar a estas el mismo trato excepcional que a las condiciones permanentes o prolongadas mencionadas en la oración anterior.[5] (Traducción suplida).

---

[5] El texto original en inglés es el siguiente:

> *For purposes of this section, a medical condition includes an ascertainable physiological condition (e.g., a urinary system dysfunction) or a medically documented preexisting psychological disorder, but does not include unsupported assertions of ''situational anxiety'' or dehydration. Permanent or long-term medical conditions are those physiological, anatomic, or psychological abnormalities documented as being present prior to the attempted collection, and considered not*

Se deduce de la sección antes citada, íd., que las circunstancias extraordinarias que justifican no realizar una prueba de dopaje con muestra de orina se tienen que relacionar con una condición médica documentada. También se requiere, como norma general, que la condición fisiológica sea permanente o prolongada. Íd. Ahora bien, la Sec. 13.5 de las directrices federales, íd., hace mención de unas condiciones médicas agudas o temporales que pueden interferir con la recolección de la muestra de orina por un período de tiempo limitado. Estas condiciones temporales no pueden tener el mismo trato que las condiciones permanentes. Íd.

## IV

Al analizar con detenimiento los dictámenes del foro primario y del Tribunal de Apelaciones, así como los alegatos de las partes, notamos que en ellos se utilizan los términos "adulteración" y "resultado inválido" como si fueran sinónimos. Sin embargo, esa fusión de términos es incorrecta conceptualmente y confunde al momento de analizar la controversia de autos.

El Art. 5 de la Ley Núm. 59, supra, dispone con claridad que cuando los resultados señalan que una muestra fue adulterada, procede que se descarte y no se tome en cuenta. No obstante, en

_amenable to correction or cure for an extended period of time, if ever. Examples would include destruction (any cause) of the glomerular filtration system leading to renal failure; unrepaired traumatic disruption of the urinary tract; or a severe psychiatric disorder focused on genitor-urinary matters. Acute or temporary medical conditions, such as cystitis, urethritis or prostatitis, though they might interfere with collection for a limited period of time, cannot receive the same exceptional consideration as the permanent or long-term conditions discussed in the previous sentence._

este caso no podemos fundamentar nuestra decisión en esa disposición legal, porque ella solo abarca las situaciones en que el laboratorio médico certifica que una muestra fue adulterada. Aquí se trata de una muestra que arrojó un resultado inválido. Nuestra Asamblea Legislativa no definió el término "resultado inválido" ni reguló de forma expresa qué ocurre cuando una muestra se cataloga de esa forma. Ahora bien, el legislador sí mencionó expresamente que las muestras se deben administrar conforme las directrices federales. Art. 5 de la Ley Núm. 59, supra.

Procede entonces, acudir a ese cuerpo reglamentario para dilucidar la controversia que nos ocupa. Después de todo, debemos "imprimir efectividad a la intención del legislador y garantizar así que se cumpla con el propósito para el cual fue creada la medida". Báez Rodríguez et al. v. E.L.A., 179 D.P.R. 231, 244 (2010). Véase, además, Rosario Mercado v. ELA, Op. de 26 de septiembre de 2013, 2013 T.S.P.R. 104, 2013 J.T.S. 107, 189 D.P.R. _ (2013).

El Tribunal de Primera Instancia denegó la sentencia sumaria por entender que era un hecho material en controversia demostrar que el señor Ortiz fue el responsable de que la prueba de dopaje de 24 de enero de 2011 tuviese un resultado inválido. Sin embargo, conforme la definición que contiene la Sec. 1.5 de las directrices federales, supra, en un resultado inválido es imposible saber si una muestra fue adulterada o sustituida, o si arrojó un resultado positivo o negativo para una droga en particular. Por consiguiente, es insustancial dilucidar quién tuvo la culpa de que la muestra arrojara un resultado inválido. Lo único que está claro es que la prueba no arrojó un resultado negativo y por eso no se le puede contar como si lo hubiera

hecho. Cónsono con lo anterior, las directrices federales definen una prueba cancelada como aquella en que la muestra es inválida y la persona a la que se le hace la prueba no tiene una explicación para ello. Íd. Se deduce entonces que cuando una muestra arroja un resultado inválido y el donante no puede ofrecer una explicación, procede cancelar la prueba, que es equivalente a descartarla. Resolver de otra forma sería un contrasentido porque de un resultado inválido no se puede concluir nada.

De los hechos surge que al señor Ortiz se le tomaron tres muestras en un año; el 24 de enero, el 28 de enero y el 11 de febrero de 2011. De acuerdo a lo que hemos discutido, la prueba que se realizó el 24 de enero de 2011 debe descartarse porque arrojó un resultado inválido y el señor Ortiz no ofreció una explicación válida para ello. Así pues, para efectos del Art. 5 de la Ley Núm. 59, supra, Holsum estaba facultado para realizar la prueba de dopaje de 11 de febrero de 2011, pues con esta se cumplía con el máximo de dos pruebas al año que faculta la ley.

En este caso, el Tribunal de Primera Instancia concluyó que el único hecho en controversia era si el empleado fue quien causó que la prueba fuese inválida. Recordemos que un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable. Zapata Berríos v. J.F. Montalvo, Op. de 27 de agosto de 2013, 2013 T.S.P.R. 95, 2013 J.T.S 98, pág. 15, 189 D.P.R. __ (2013); Pepsi Cola v. Mun. de Cidra et al., 186 D.P.R. 713, 756 (2012); S.L.G. Szendrey Ramos v. Consejo Titulares, 184 D.P.R. 133, 167 (2011); Ramos Pérez v. Univisión de P.R., 178 D.P.R. 200, 213 (2010). Ya hemos explicado por qué determinar quién causó que la prueba diera un resultado inválido es un hecho inmaterial al momento de dictar sentencia sumaria en este caso. Véanse, Regla 36 de Procedimiento Civil, 32 L.P.R.A.

Ap. V; Zapata Berríos v. J.F. Montalvo, supra; Pepsi Cola v. Mun. de Cidra et al., supra, pág. 756; S.L.G. Szendrey Ramos v. Consejo Titulares, supra, pág. 167; Ramos Pérez v. Univisión de P.R., supra, pág. 213.

Ahora bien, nótese que para que proceda una moción de sentencia sumaria no solo se requiere la inexistencia de hechos en controversia, sino que la sentencia tiene que proceder conforme al derecho sustantivo aplicable. Regla 36.3(c) de Procedimiento Civil, supra; Ramos Pérez v. Univisión, supra, pág. 215. Por eso, el proponente de la moción de sentencia sumaria debe establecer su derecho con claridad. Abrams Rivera v. E.L.A., supra, pág. 932; Ramos Pérez v. Univisión, supra, pág. 213.

Es un hecho incontrovertido que la prueba de dopaje de 11 de febrero de 2011, que dio positivo a cocaína, se realizó con una muestra de cabello. Esa actuación del patrono colisiona con el texto cristalino del Art. 5 de la Ley Núm. 59, supra, que establece que "las pruebas se harán mediante **muestra de orina**, salvo circunstancias en que no sea posible". (Énfasis suplido.) Del expediente no surgen condiciones médicas, según ese término se define en la Sec. 13.5 de las directrices federales, supra, que justificaran desviarse del mandato que establece el Art. 5 de la Ley Núm. 59, supra. Es decir, entre los hechos incontrovertidos que aparecen en la moción de sentencia sumaria no se mencionan condiciones médicas prolongadas o temporales, según se recogen esos términos en las directrices federales, que impidieran que la prueba de dopaje de 11 de febrero de 2011 se realizara con una muestra de orina. Por tal razón, Holsum no podía realizar la prueba de dopaje con una muestra de cabello.

Ante ese escenario, no podemos tomar en consideración el resultado de esa prueba pues no se realizó según dispone el Art. 5 de la Ley Núm. 59, supra. Adviértase que Holsum alegó en la moción de sentencia sumaria que existía justa causa para el despido por el hecho de que el señor Ortiz había arrojado positivo a cocaína por segunda vez en la prueba de dopaje de 11 de febrero de 2011. Como estamos impedidos de tomar en consideración el resultado de esa prueba ilegal, el planteamiento de justa causa que esgrimió Holsum es improcedente. De todas las pruebas que se le realizaron el señor Ortiz, solo podemos tomar en consideración la segunda que se efectuó el 28 de enero de 2011, y que arrojó un resultado negativo.

En su consecuencia, como cuestión de derecho no procede dictar sentencia sumaria a favor del patrono Holsum. Art. 2 de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185b.

**V**

Conviene recordar que nuestro ordenamiento jurídico permite que se dicte sentencia sumaria en contra de la parte que la solicita, siempre que no existan hechos materiales que estén en controversia. P.A.C. v. E.L.A. I, 150 D.P.R. 359, 374 (2000); Col. Ing. Agrim. P.R. v. A.A.A., 131 D.P.R. 735, 782 (1992). Sin embargo, principios elementales de derecho procesal apelativo impiden que en este caso seamos nosotros quienes dilucidemos –en primera instancia– si procede dictar sentencia sumaria a favor del señor Ortiz.

Es norma básica de nuestro derecho procesal apelativo que todo escrito presentado ante un tribunal apelativo señale, discuta y fundamente el error o los errores que se le imputan al

foro apelado o recurrido. Morán v. Martí, 165 D.P.R. 356, 366 (2005). Es decir,

> [s]olamente mediante un señalamiento de error y una discusión fundamentada, con referencia a los hechos y las fuentes de derecho en que se sustenta, podrá el foro apelativo estar en posición de atender los reclamos que se le plantean. Íd.

Asimismo, para poder presentar los distintos escritos apelativos, se tienen que pagar los derechos arancelarios correspondientes. Véase In re Aprob. Der. Arancelarios R.J., 179 D.P.R. 985 (2010). Sobre el particular, la Sec. 5 de la Ley Núm. 17 de 11 de marzo de 1915, 32 L.P.R.A. sec. 1481, establece que serán nulos todos los documentos judiciales a los que no se adhieran los sellos de rentas internas requeridos. Véanse, además, Meléndez v. Levitt & Sons. Of P.R., Inc., 106 D.P.R. 437, 438 (1977); Maldonado v. Pichardo, 104 D.P.R. 778, 781-82 (1976); Vázquez Suárez v. Rivera, 69 D.P.R. 947, 951 (1949).

Por ende, los foros apelativos no pueden considerar una controversia que no fue planteada, a menos que sea necesario para evitar una injusticia manifiesta. Depto. de la Familia v. Shrivers Otero, 145 D.P.R. 351, 358 (1998). Véanse, además, E.L.A. v. Northwestern Selecta, 185 D.P.R. 40, 55-56 (2012); American Bar Association, Standards Relating to Appellate Courts, Commentary, 1994, Sec. 3.00, págs. 23-28. Dicho de otro modo, los tribunales apelativos deben resolver solamente "los asuntos que se le plantean en los recursos que tenga ante su consideración". Depto. de la Familia v. Shrivers Otero, supra, pág. 359.

La norma anterior se debe a que nuestro derecho es de naturaleza rogada. Vilanova et al. v. Vilanova et al., 184

D.P.R. 824, 846-847 (2012); Pueblo v. Pérez, 159 D.P.R. 554, 560 (2003); J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da Ed., San Juan, Publicaciones J.T.S., 2011, Tomo IV, pág. 1256. Recordemos que "los tribunales son organismos que resuelven las disputas que se suscitan entre los ciudadanos y que sean llevadas ante su consideración, sin que les sea dable intervenir *motu proprio* en tales disputas". R. Elfren Bernier y J. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da ed. Rev., San Juan, Publicaciones J.T.S., 1987, pág. 3.

El hecho de que nuestro sistema de derecho sea de naturaleza rogada implica que, como norma general, este Foro solo puede revisar las controversias sobre las cuales pasó juicio el Tribunal de Apelaciones. Cestero Aguilar v. Jta. Dir. Condominio, 184 D.P.R. 1, 22 (2011). Ello se debe a que "nuestra competencia apelativa en recursos de certiorari se limita a revisar las sentencias o resoluciones emitidas por el Tribunal de Apelaciones". Íd. Véase, además, Art. 3.002 de la Ley Núm. 201-2003, según enmendada, conocida como Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, 4 L.P.R.A. sec. 24s.

En este caso, el patrono Holsum es quien ha solicitado en todos los foros competentes que se dicte sentencia sumaria a su favor. En ningún momento el señor Ortiz ha hecho un planteamiento similar. No lo hizo ante el foro primario ni ante los foros apelativos. En atención a la naturaleza rogada de nuestro derecho, nos limitamos a declarar no ha lugar la moción de sentencia sumaria que presentó Holsum y devolvemos los autos al Tribunal de Primera Instancia para la continuación de los procedimientos de forma consecuente con nuestros

pronunciamientos. No podemos resolver este asunto sin que ningún foro de jerarquía inferior lo haya considerado primero, y sin que la parte recurrida lo haya solicitado y mucho menos, argumentado. Eso borraría las distinciones entre este Foro y el Tribunal de Primera Instancia, y cercenaría el derecho de la parte afectada a apelar cualquier dictamen final en su contra. Véase, en general, Crespo Quiñones v. Santiago Velázquez, 176 D.P.R. 408 (2009).

## VI

Por los fundamentos expuestos, se expide un auto de certiorari, se confirma la determinación del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para procedimientos posteriores compatibles con lo resuelto aquí.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Orlando Ortiz

    Recurrido


     v.


Holsum de Puerto Rico, Inc.

    Peticionario

                        CC-2013-306


SENTENCIA


En San Juan, Puerto Rico, a 7 de marzo de 2014.

Por los fundamentos expuestos en los acápites I-IV y VI de la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se expide un auto de <u>certiorari</u>, se confirma la determinación del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para procedimientos posteriores compatibles con lo resuelto aquí.


Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Estrella Martínez hizo constar la siguiente expresión:


El Juez Asociado señor Estrella Martínez está conforme con las Partes I, II, III, IV y VI, y concurre con la Parte V de la Opinión de este Tribunal. Como bien reconoce la mayoría en la Parte V de la Opinión, nuestro ordenamiento jurídico permite que se dicte sentencia sumaria en contra de la parte que la solicita, siempre

que no existan hechos materiales que estén en controversia. Sin embargo, a renglón seguido pautan innecesaria y erróneamente que la naturaleza rogada de nuestro sistema de derecho impediría a este Tribunal conceder ese remedio a una parte que le asista ese derecho, si acude como parte recurrida. Estas expresiones constituyen *obiter dictum*, ya que en el caso ante nos el empleado recurrido nunca ha solicitado que se dicte sentencia sumaria a su favor y se ha opuesto a que esa se emita por entender que es necesario que el foro primario escuche su testimonio por existir, reconocido por él, controversias materiales y pertinentes que impiden disponer el caso sumariamente. Ante ese cuadro, resulta innecesaria la discusión de la Parte V de esta Opinión. Máxime cuando echan por la borda la máxima de que aunque nuestro ordenamiento el Derecho es rogado, ello nos impide conceder el remedio procedente. Los tribunales siempre debemos conceder lo que proceda en Derecho, que puede o no coincidir con lo que se solicita. Como el empleado recurrido es el primero en reconocer que existen hechos materiales en controversia, no estamos ante el caso adecuado para evaluar si este Tribunal tiene la potestad de dictar, por proceder en Derecho, un remedio sumario a favor de la parte contraria a la peticionaria, por no existir controversias de hecho.

La Jueza Asociada señora Fiol Matta concurrió sin opinión escrita. El Juez Presidente señor Hernández Denton emitió una Opinión Disidente a la que se unió la Juez Asociada señora Rodríguez Rodríguez. La Jueza Asociada señora Pabón Charneco no intervino.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Orlando Ortiz

    Recurrido

    v.                             CC-2013-306

Holsum de Puerto Rico, Inc.

    Peticionario

Opinión Disidente emitida por el Juez Presidente señor HERNÁNDEZ DENTON a la cual se une la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ.

San Juan, Puerto Rico, a 7 de marzo de 2014.

Disentimos de lo resuelto en la Opinión mayoritaria por tres razones. Primero, al momento de computar las dos pruebas anuales de dopaje que se pueden realizar al empleado, la Ley de Sustancias Controladas, *infra*, no permite descartar una prueba que arrojó un resultado inválido; solo permite descartar aquella cuyo resultado de laboratorio determine que la muestra fue adulterada. Segundo, podíamos dictar Sentencia Sumaria en este caso en contra de la parte que la solicitó, pues nuestro ordenamiento lo permite. Tercero, si una mayoría de este Tribunal no estaba dispuesta a dictar Sentencia Sumaria, procedía denegar el recurso porque no se configura alguna de las tres excepciones que permiten obviar la norma general de que las resoluciones

interlocutorias dictadas en un procedimiento laboral sumario no son revisables.

I.

Los hechos que originaron el caso de epígrafe están expuestos correctamente en la Opinión mayoritaria, por lo que prescindiremos de detallarlos nuevamente. Dicho esto, veamos el derecho aplicable que fundamenta nuestra posición.

La Ley Núm. 59-1997, 29 L.P.R.A. sec. 161 *et seq.* (Ley de Pruebas de Sustancias Controladas), autoriza a los patronos a implantar programas de detección de sustancias controladas siempre que cumplan con lo dispuesto en dicha ley. Según el estatuto, "todo empleado podrá ser sometido a un máximo **de dos pruebas al año**, a menos que en una de estas pruebas se haya obtenido un resultado positivo debidamente corroborado o como parte de un programa de consejería, tratamiento o rehabilitación". 29 L.P.R.A. sec. 161b (h) (Énfasis suplido). Dichas pruebas

> se harán mediante muestra de orina, salvo circunstancias en que no sea posible tomar la misma, y se administrará de acuerdo con los procedimientos analíticos y de cadena de custodia de muestra científicamente aceptables, de modo tal que se proteja al máximo la intimidad del empleado, y de conformidad con el *Mandatory Guidelines for Federal Workplace Drug Testing Program*. […]
>
> En casos en que se determine **la adulteración de una muestra, ésta será descartada y se solicitará al empleado que provea una nueva**, esta vez ante la presencia de una persona de su mismo sexo, miembro del personal del laboratorio. 29 L.P.R.A. sec. 161b (d). (Énfasis suplido).

Según las directrices para el programa federal de prueba de drogas en el lugar del trabajo, una muestra adulterada es:

"[a] specimen that has been altered, **as evidenced by test results** showing either a substance that is not a normal constituent for that type of specimen or showing an abnormal concentration of an endogenous substance". 73 F.R. sec. 71858. (Énfasis suplido). Asimismo, estas establecen que una prueba cancelada es: "[t]he result reported by the MRO to the Federal agency when a specimen has been reported to the MRO as invalid result (and the donor has no legitimate explanation) or rejected for testing, when a split specimen fails to reconfirm, or when the MRO determines that a fatal flaw or unrecovered correctable error exists in the forensic records". Íd. Por último, definen un resultado inválido como: "[t]he result reported by an HHS-certified laboratory in accordance with the criteria established in Section 3.8 **when a positive, negative, adulterated, or substituted result cannot be established for a specific drug or specimen validity test.**" Íd. (Énfasis suplido).

En virtud de lo anterior, la Ley de Pruebas de Sustancias Controladas, *supra*, y las directrices federales solo permiten que se descarte una prueba cuando el laboratorio determinen que la muestra fue adulterada. Al repetir dicha prueba, la descartada no contará para efectos del límite de dos pruebas anuales que impone el estatuto. Íd. En cambio, una prueba puede ser cancelada por varias razones no atribuibles al empleado. Esto, pues las directrices federales definen el resultado inválido como uno en el que no se puede certificar un resultado positivo, negativo, adulterado o sustituido. Por ende, un resultado inválido no

equivale a un resultado que refleje que la muestra fue adulterada. Consecuentemente, ambos resultados no pueden ser tratados de la misma forma. La Ley de Pruebas de Sustancias Controladas, *supra*, solo permite descartar un resultado cuando se determina que la prueba fue adulterada y no incluye los resultados inválidos en esta disposición. Siendo así, un resultado inválido debe ser contabilizado para efectos del límite de dos pruebas anuales que impone el estatuto.

No obstante, la Opinión mayoritaria pauta que "cuando una muestra arroja un resultado inválido y el donante no puede ofrecer una explicación, procede cancelar la prueba, que es equivalente a descartarla". Opinión mayoritaria, pág. 13. No podemos estar de acuerdo con esta interpretación por ser contraria a lo expuesto anteriormente. Además, ¿cómo podemos exigir al donante que nos explique por qué una muestra arrojó un resultado inválido, cuando el mismo laboratorio no pudo determinar de esa muestra un resultado positivo, negativo, adulterado o sustituido? Precisamente, por el hecho de que "de un resultado inválido no se puede concluir nada" es que no procede descartarlo en perjuicio del derecho estatutario del donante a no ser sometido a más de dos pruebas de dopaje al año.

En el caso ante nos, Holsum de Puerto Rico, Inc. (Holsum) pretende que no se compute el resultado inválido, al igual que se haría con uno adulterado. No obstante, la Ley de Pruebas de Sustancias Controladas, *supra*, interpretada conforme a las guías federales, no permite descartar un resultado inválido al momento de computar las pruebas

realizadas al empleado durante determinado año. Los resultados del laboratorio no determinaron que la prueba realizada al Sr. Orlando Ortiz hubiera sido adulterada. En cambio, el Dr. Wilfredo Avilés indicó que el resultado era inválido. Por tanto, esta primera prueba realizada al señor Ortiz debe ser contabilizada al momento de computar las dos pruebas anuales de dopaje permitidas por ley.

Consecuentemente, la tercera prueba de dopaje realizada al señor Ortiz mediante una muestra de cabello se realizó en exceso del límite de dos pruebas anuales de dopaje permitido por la Ley de Pruebas de Sustancias Controladas, *supra*. En vista de que Holsum estaba impedido de realizar dicha prueba y de que esta fue la única que arrojó un resultado positivo al uso de sustancias controladas, no procede determinar mediante Sentencia Sumaria que Holsum tenía justa causa para despedir al señor Ortiz. Véase, Art. 2 de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185b.

Al contrario, lo que procedía en este caso era dictar Sentencia Sumaria a favor del señor Ortiz. Tal y como reconoce la Opinión mayoritaria, "nuestro ordenamiento jurídico permite que se dicte sentencia sumaria en contra de la parte que la solicita, siempre que no existan hechos materiales que estén en controversia". Opinión mayoritaria, pág. 16, citando a P.A.C. v. E.L.A. I, 150 D.P.R. 359, 374 (2000); Col. Ing. Agrim. P.R. v. A.A.A., 131 D.P.R. 735, 782 (1992). Si una mayoría de este Tribunal no estaba dispuesta a dictar Sentencia Sumaria a favor del señor Ortiz, entonces procedía denegar el recurso.

Hemos resuelto que el procedimiento laboral sumario establecido en la Ley Núm. 2 de 17 de octubre de 1961, 32 L.P.R.A. sec. 3118 *et. seq.*, al amparo del cual se originó el pleito de epígrafe, impide que las resoluciones interlocutorias sean revisables porque lo contrario desvirtuaría el carácter sumario que debe caracterizar dicho procedimiento. Dávila, Rivera v. Antilles Shipping,Inc., 147 D.P.R. 483, 498 (1999). Al respecto, señalamos que "la sobrecarga de casos pendientes ante los tribunales apelativos impedían la rápida solución de estos recursos […] En consecuencia, concluimos que la parte que pretendiera impugnar tales resoluciones debía esperar hasta la sentencia final e instar el recurso pertinente a base del alegado error cometido". Aguayo Pomales v. R & G Mortgage, 169 D.P.R. 36, 45 (2006).

Solo existen tres excepciones a esta norma general de autolimitación: (1) cuando la resolución interlocutoria fue dictada por el Tribunal de Primera Instancia sin jurisdicción para ello, (2) cuando se trate de un caso extremo en que la revisión inmediata del foro apelativo dispone del caso en forma definitiva o aporta a su pronta disposición y (3) cuando la revisión inmediata evite una grave injusticia. Aguayo Pomales v. R & G Mortgage, *supra*, pág. 45; Dávila, Rivera v. Antilles Shipping,Inc., *supra*.

Aunque la Opinión mayoritaria invoca la segunda excepción, no dispone del caso por completo pues se niega a dictar Sentencia Sumaria. Tampoco aportó a la pronta disposición del recurso, sino que la interrumpió. El Tribunal

de Primera Instancia pudo haber resuelto la controversia de autos ya fuera resolviendo que la primera prueba impedía a Holsum realizar la tercera o que, a pesar de que procedía descartar la primera prueba, las guías federales impedían realizar la tercera mediante una muestra de cabello. Por ende, la excepción invocada no se configuró y este recurso debió denegarse.

## II.

Por todo lo anterior, disentimos. En cambio, hubiéramos dictado Sentencia Sumaria a favor del señor Ortiz o, en la alternativa, hubiéramos denegado el recurso.


Federico Hernández Denton
Juez Presidente