EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| María Burgos López, et al<br><br>    Recurridos<br><br>              v.<br><br>LXR/Condado Plaza Hotel & Casino, et al<br><br>    Peticionarios<br><br>Ray Engineers, P.S.C.<br><br>    Recurridos | Apelación<br><br>2015 TSPR 56<br><br>193 DPR ____ |

Número del Caso:    AC-2013-86


Fecha: 5 de mayo de 2015


Tribunal de Apelaciones:

      Región Judicial de San Juan


Abogada de la Parte Peticionaria:

      Lcda. Margarita Rosado - Toledo


Abogado de la Parte Recurrida:

      Lcdo. Juan J. Janeiro Velilla



Materia: Obligaciones y Contratos – Activación de cláusula de indemnización o liberación de responsabilidad ("hold harmless") en contrato de obra.



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

María Burgos López, et al

    Recurridos

       v.

LXR/Condado Plaza Hotel &       AC-2013-0086
Casino, et al

    Peticionarios

Ray Engineers, P.S.C.

    Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor MARTINEZ TORRES.

En San Juan, Puerto Rico, a 5 de mayo de 2015.

En esta ocasión nos corresponde determinar en qué momento se activa la obligación de un contratista de defender al principal conforme a una cláusula de indemnización o liberación de responsabilidad ("hold harmless"). Por los fundamentos que exponemos a continuación, concluimos que, conforme al texto pactado, la obligación de defender se activa desde la presentación de una reclamación en la que se alegue que los daños sufridos por el reclamante fueron consecuencia, total o parcialmente, de la negligencia del contratista.

I

Posadas de Puerto Rico, L.L.C. ("Posadas") es la dueña y operadora del Hotel Condado Plaza. Posadas y Ray Engineers, P.S.C. ("Ray") suscribieron un contrato de servicios para la renovación y remodelación del hotel, incluida el área de la entrada y del vestíbulo, también conocida como el redondel. Conforme a ese contrato, Ray tenía la obligación de preparar y certificar los planos finales arquitectónicos y de ingeniería para el proyecto. Esos planos arquitectónicos debían incluir la preparación, tratamiento y terminación de todas las superficies, incluyendo los pisos y sus elevaciones. Así las cosas, los trabajos de remodelación fueron finalizados por Ray y el Hotel reabrió sus puertas.

Posteriormente, el 7 de enero de 2009, los esposos María Burgos López y Miguel Mercado Alvarado y la Sociedad Legal de Gananciales compuesta por ambos ("los esposos Burgos-Mercado"), presentaron una demanda por daños y perjuicios contra Posadas y Ray. Alegaron que mientras la señora Burgos López se encontraba en los predios del hotel, perdió el balance por motivo de un escalón o bajada imperceptible, pues se trataba de una superficie continua, sin variante de colores ni alguna otra indicación que ayudara a detectar su existencia. Se alegó contra Ray que la condición peligrosa consistió en permitir que el escalón o bajada quedara o fuera construido de una forma

totalmente imperceptible a la vista. Apéndice, págs. 132-133.

Posadas contestó la demanda y, a su vez, presentó una demanda contra Ray como tercero demandado, la cual fue acogida por el Tribunal de Primera Instancia como una demanda contra coparte. Posadas alegó que Ray fue quien estuvo a cargo del diseño de la entrada, las especificaciones de las elevaciones, colores y textura de la superficie peatonal y vehicular, y que las alegaciones de los demandantes referentes a que el área descrita es una condición peligrosa incidían directamente sobre las labores hechas por Ray. Del mismo modo, Posadas reclamó el cumplimiento específico de la sección 12.2.3.1 del contrato que suscribió con Ray. En la misma, según alegó, Ray se comprometió a indemnizar, liberar de responsabilidad y asumir la defensa de Posadas por todas las reclamaciones o pérdidas que surgieran, en todo o en parte, como resultado de su negligencia, errores u omisiones. Apéndice, pág. 59.

Tras varios incidentes procesales, los esposos Burgos-Mercado presentaron junto a Ray una estipulación transaccional parcial. A raíz de esta estipulación, el Tribunal de Primera Instancia dictó sentencia parcial con perjuicio en cuanto a Ray y su aseguradora. Igualmente, los demandantes llegaron a un acuerdo con Posadas y presentaron una moción de desistimiento. El Tribunal de

Primera Instancia dictó sentencia parcial con perjuicio en cuanto a Posadas.

De esta forma, la controversia restante se limitó a la demanda contra coparte que presentó Posadas contra Ray en cuanto al cumplimiento específico de la cláusula de "hold harmless". En particular, la cláusula en controversia estipulada por las partes establecía lo siguiente:

> The Architect [Ray] shall defend, indemnify and hold harmless the Owner [Posadas], Owner´s Lender, Owner´s affiliated companies, Owner´s consultants and their respective officers, directors, employees and agents (the "Indemnities"), for all claims, damages, losses, fees, expenses and costs (including but not limited to legal fees and expenses and court, mediation, and arbitration costs) that arise as result, in whole or in part, of the intentional acts, negligence, errors, omissions, or failure to perform by the Architect [Ray], its employees, its agents, or its Consultants except for that portion of such damages, losses, fees, expenses and costs that are caused solely by the negligence of Owner. Apéndice, pág. 151.

Además, las partes estipularon en corte abierta la autenticidad de varios documentos, entre los que se encontraba una carta de 7 de octubre de 2008 enviada por Posadas a Ray. En esa carta, Posadas le notificó a Ray el incidente de la señora Burgos López y le solicitó que diera cumplimiento específico a su obligación de defenderlos y mantenerlos libre de responsabilidad por el incidente. Apéndice, págs. 165 y 486. De igual forma, se estipuló en corte abierta la autenticidad de una carta de 7 de enero de 2009, remitida por Ray a Posadas, en la que Ray condicionó su obligación de proveer la defensa a que Posadas produjera prueba que estableciera su negligencia.

Apéndice, págs. 165 y 535. El Tribunal de Primera Instancia también incluyó como un hecho incontrovertido que el 26 de enero de 2009, Posadas le envió una segunda carta a Ray en la que le notificó que la demanda de epígrafe ya había sido presentada y en la que le solicitó una vez más que asumiera su representación legal en ese procedimiento. Apéndice, págs. 29 y 535-A.

Ante ese cuadro, Ray presentó una moción de sentencia sumaria en la que solicitó la desestimación de la demanda contra coparte. Posadas presentó su oposición a esta moción y, a su vez, presentó una contra solicitud de sentencia sumaria para que se le ordenara a Ray reembolsarle los gastos en los que se vio obligado a incurrir para defenderse debido a la negativa de Ray de proveerle representación legal. Como anejo a su moción de sentencia sumaria, Posadas incluyó una declaración jurada del Lcdo. Francisco J. Colón Pagán, en la que este certifica el monto facturado por los servicios legales prestados a Posadas en el caso de autos. Apéndice, pág. 557. También se incluyó como anejo copia de las facturas y cheques pagados por esos servicios. Apéndice, págs. 558-633. Ray no se opuso a esta solicitud.

Posteriormente, el Tribunal de Primera Instancia emitió una sentencia declarando no ha lugar la moción de sentencia sumaria de Ray y declarando con lugar la moción de sentencia sumaria de Posadas. De esta forma, el foro primario resolvió que las alegaciones de negligencia

contenidas en la demanda de la señora Burgos López en contra de Posadas y Ray activaron la obligación de este último de defender o proveer representación legal a Posadas. Así, el foro primario ordenó a Ray a que pagara a Posadas la suma de $59,880.67, más los intereses a razón de 4.25 por ciento a partir de la notificación de la sentencia, por concepto de los honorarios de abogado en los que tuvo que incurrir Posadas para defenderse de la reclamación de los esposos Burgos-Mercado hasta ese momento.

Inconforme con la determinación del Tribunal de Primera Instancia, Ray acudió ante el Tribunal de Apelaciones. En su recurso de apelación, Ray planteó por primera vez que existían hechos materiales en controversia que impedían la resolución de este caso mediante sentencia sumaria. Uno de los hechos materiales que alegó que estaba en controversia era la determinación de si Ray fue, en efecto, negligente, como condición para que se activase su obligación de proveer defensa a Posadas. También planteó que el monto de los gastos y honorarios de abogado en los que incurrió Posadas estaba en controversia.

El foro apelativo intermedio revocó la sentencia del Tribunal de Primera Instancia y resolvió que el asunto de la negligencia de Ray era un hecho esencial material en controversia que debía resolverse en un juicio en sus méritos. Así, concluyó que no procedía resolver

sumariamente que la cláusula conocida como "hold harmless" se activó, pues nunca se probó la negligencia de Ray.

Insatisfecho, Posadas presentó un recurso de apelación ante este Tribunal, el cual acogimos como una solicitud de certiorari.

## II.

## A.

En nuestro ordenamiento jurídico se reconoce el principio de libertad de contratación, el cual permite a las partes pactar los términos y condiciones que tengan por convenientes. Arthur Young & Co. v. Vega III, 136 DPR 157 (1994). No obstante, dicha libertad no es infinita. Encuentra su límite en el Art. 1207 del Código Civil de Puerto Rico, 31 LPRA sec. 3372. Allí se establece que estos pactos, cláusulas y condiciones serán válidos, siempre y cuando no sean contrarios a las leyes, la moral, ni al orden público.

Por otro lado, una vez perfeccionados, los contratos tienen fuerza de ley entre las partes, "y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley". Íd., Art. 1210, sec. 3375. Véase, además, Oriental Bank & Trust v. Perapi S.E., Op. de 5 de noviembre de 2014, 2014 TSPR 133, 192 DPR ___.

Como corolario de estos principios, hemos validado anteriormente los acuerdos y las cláusulas de

indemnización o liberación de responsabilidad, conocidos comúnmente en el campo de la construcción como "hold harmless agreements" o "indemnity clauses". Natal Cruz v. Santiago Negrón, 188 DPR 564, 584-585 (2013).

Este tipo de acuerdo permite a "las partes anticipa[r] el ámbito de sus obligaciones y planifica[r] de acuerdo con ello". Torres Solís et al. v. A.E.E. et als., 136 DPR 302, 314 (1994). Véase, además, Charles M. Pisano, Judicial Interpretation of Indemnity Clauses, 48 La. L. Rev. 169 (1987). De esta forma, "una parte se compromete o asume la obligación de defender a otra de las reclamaciones que le haga un tercero y de las que no [necesariamente] sería responsable si no existiera el contrato". Natal Cruz v. Santiago Negrón, supra, pág. 185.

Estos acuerdos y cláusulas suelen incluir un lenguaje estándar reproducido de contratos modelos preparados por organizaciones que agrupan profesionales de la industria de la construcción. Ejemplos de esto son las publicaciones "General Conditions of the Contract for Construction" del American Institute of Architects y "Standard General Conditions of the Construction Contract" del Engineer´s Joint Contract Documents Committee. 4 Steven G.M. Stein, Construction Law, ¶ 13.17, pág. 13-128 (LexisNexis Matthew Bender) (2014). Véanse, además: 5 National Institute of Construction Law, Inc. (NICL), Contruction and Design Law, § 36.4c.3, págs. 102-104 (1996) y Robert F. Cushman y Thomas G. Bottum, Architect and Engineer Liability: Claims

Against Design Professionals, § 5.19 Indemnification, págs. 90-91 n.57 (1987). Así lo hemos reconocido en el pasado. Este Tribunal ha expresado que "[e]n el derecho americano, donde rigen principios similares a los nuestros en materia de contratación, se han adoptado determinadas reglas para la interpretación de documentos de descargo (release) [hoy conocidos como acuerdos de indemnización o relevo de responsabilidad ("hold harmless")], **que bien podemos hacerlas nuestras sin menoscabo alguno para nuestro derecho estatutario**". (Énfasis nuestro). Cabrera v. Doval, 76 DPR 777, 781-782 (1954). Ese ejercicio adjudicativo no es extraño en jurisdicciones como la nuestra.

Puerto Rico cuenta con un sistema jurídico mixto. S.L.G. Rodríguez Rivera v. Bahía Park, 180 DPR 340, 369 (2010) citando a J. Trías Monge, The Structure of the American Legal System – Its Sources, Forms and Theory of Law, 51 Rev. Jur. UPR 11, 16 (1982). Véase, además, Edgardo Rivera García, El andamiaje legal de Puerto Rico: fusión enriquecida del derecho común anglosajón y la tradición civilista, 82 Rev. Jur. UPR 687 (2013). Esto es producto de la "interacción centenaria de principios legales, casuística, leyes y códigos provenientes tanto del derecho civil español como del derecho consuetudinario (common law) estadounidense". S.L.G. Rodríguez Rivera v. Bahía Park, supra. Por esta razón, en casos en donde hemos tenido ante nuestra consideración controversias

relacionadas a figuras que se **originan y desarrollan** en el "common law" estadounidense y sobre las que **carecemos de "precedentes que atiendan <u>específicamente</u> la controversia ante nos**", no hemos dudado en recurrir a la jurisprudencia de ese sistema. (Énfasis suplido). <u>Residentes Parkville v. Diaz</u>, 159 DPR 374, 386 (2003).

Así, hemos reiterado que no dudaremos "en […] adoptar doctrinas y normas de interpretación del common law cuando las […] consider[emos] acertadas y enriquecedoras de nuestro Derecho". <u>Arthur Young & Co. v. Vega III</u>, <u>supra</u>, pág. 169. En esos casos apropiados, "la ley común no es una frase que debemos oír como un conjuro, y por otro lado tampoco debemos alarmarnos por la mera circunstancia de que cualquier doctrina en particular, por estar basada en la justicia y la razón universal, resulta tener su origen en la ley común." <u>Futurama Imp. Corp. v. Trans Caribbean</u>, 104 DPR 609, 615 (1976), citando con aprobación a <u>Municipio de Vega Baja v. Smith</u>, 27 DPR 632, 637-638 (1919).

Ahora bien, al analizar y adoptar en nuestro ordenamiento normas del "common law" estadounidense, es importante que actuemos "con la reflexión y corrección debida para que no desnaturalicemos los principios de derecho civilistas y del derecho consuetudinario que constituyen parte fundamental de nuestro ordenamiento legal autóctono y que, en conjunto, en sus ámbitos respectivos, conforman el derecho puertorriqueño

contemporáneo". S.L.G. Rodríguez Rivera v. Bahia Park, supra.

En atención al origen de los acuerdos de indemnización o relevo de responsabilidad ("hold harmless") en la industria de la construcción, nos servimos del desarrollo de la doctrina y jurisprudencia en el "common law" estadounidense que los interpreta, para estudiar los contornos de la obligación de defender, figura central en controversia en el caso que hoy atendemos. No es apropiado obviar esa doctrina específica y en cambio, resolver la controversia de este caso únicamente a base del principio general de buena fe y lealtad contractual, sin referencia alguna a normas, doctrinas o casos provenientes del sistema donde se origina la figura en cuestión y que atiendan el asunto ante nuestra consideración de forma clara y expresa. Utilizar esa metodología puede llevar a que se interprete una cláusula modelo de forma inconsistente a lo que se ha resuelto en la jurisdicción de procedencia de la misma.

La estabilidad del sistema legal y del tráfico comercial no puede estar sujeta a esa ambigüedad e incertidumbre. Las partes contratantes utilizan conscientemente un lenguaje que en su industria tiene un significado particular. No seguir esos parámetros en los que las partes depositaron sus expectativas puede afectar negativamente la forma en que se conducen los negocios en ese sector económico en Puerto Rico.

En este caso, las partes pactaron un lenguaje específico que proviene de modelos de contratos uniformes preparados por la industria de la construcción estadounidense. Por eso, interpretamos el lenguaje del contrato cónsono a como se ha hecho en la jurisdicción de donde proviene. De esa forma, fundamentamos el resultado al que llegamos en la intención de las partes contratantes que protege nuestro Código Civil.

En particular, la obligación de defender ("duty to defend"), ha sido definida por la jurisprudencia del "common law" estadounidense como el deber que tiene el contratista de proveer o pagar por los servicios de representación legal al principal en todas las reclamaciones cubiertas por el acuerdo de relevo de responsabilidad o de indemnización pactado entre ambos. Crawford v. Weather Shield Mfg. Inc., 187 P.3d. 424 (Cal. 2008).

Esta obligación, en este contexto, "es distinta a [...] una obligación de pagar a otro, luego de adjudicado el caso, por los gastos en que este haya incurrido para defenderse a sí mismo". (Traducción nuestra). Íd., pág. 432. De igual forma, la doctrina del "common law" estadounidense en este campo ha establecido que la obligación de defender es independiente al deber de indemnizar y, no está sujeta a los méritos de la reclamación o demanda subyacente. "When discussing an alleged breach of the duty to defend under an

indemnification agreement [...] an indemnitor´s duty to defend does not depend on the merits of the claim asserted. Instead, the duty to defend arises when potential liability is asserted against the indemnitee." (Citas omitidas). Estate of Kriefall v. Sizzler USA Franchise, Inc., 816 N.W.2d 853, 869 (Wis. 2012). Por esto, la obligación de defender "necesariamente nace tan pronto surgen reclamaciones [cubiertas por el acuerdo] en contra del [principal], y puede continuar hasta que estas sean resueltas". (Traducción nuestra). Crawford v. Weather Shield Mfg. Inc., supra, pág. 432.

Así, queda claro que en el "common law" el deber de defender no depende del resultado del litigio, ni de que en efecto se determine que el contratista debe indemnizar al principal. Por el contrario, la obligación de defender se activa al momento en que el principal le solicita al contratista que le defienda de una reclamación en donde se alegan actos cubiertos por el acuerdo ("tender of defense"). Íd., pág. 434. Véase, además, UDC-Universal Development v. CH2M Hill, 103 Cal. Rptr., 3d 684, 693 (Cal. Ct. App. 2010).

Por otra parte, aunque en un contexto distinto al de este caso, esto es, el de los contratos de seguros, nosotros también nos hemos expresado sobre el deber de defender o proveer representación legal. En específico, hemos dejado claro que en los contratos de seguros este deber "se mide, en primer término, por las alegaciones del

demandante y si dichas alegaciones establecen hechos que colocan el daño dentro de la cubierta de la póliza". PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 DPR 881, 896 (1994). Más aún, "[l]a obligación de la compañía aseguradora de asumir la representación legal surgirá cuando de una interpretación liberal de las alegaciones surja la posibilidad de que el asegurado está protegido por la póliza expedida, independientemente de cuál sea la adjudicación final del caso". Íd.[1]

Salvo que esté prohibido por ley, el alcance de los acuerdos de indemnización o relevo de responsabilidad, es decir, el grado de responsabilidad y riesgo que asumirá cada una de las partes contratantes puede ser objeto de negociación. Así, y a diferencia de la responsabilidad extracontractual, los detalles y las circunstancias en las que se activará y será exigible la responsabilidad contractual dependerán del lenguaje específico que

---

[1] Al igual que otros tribunales, solamente extrapolamos este análisis de los contratos de seguros para evaluar la obligación de defender o proveer representación legal en un contrato de indemnización como el de este caso. Véanse English v. BGP Intern., Inc., 174 S.W.3d 366 (Tex. App. 2005); General Motors Corp. v. American Ecology Environmental Services Corp., No. Civ.A.399CV2625L, 2001 WL 1029519 (N.D. Tex. 2001); St. Paul Fire & Marine Ins. Co. v. Crosetti Bros., Inc., 475 P.2d 69 (Or. 1970). Al así hacerlo, no estamos alterando las normas de interpretación de ninguno de los dos tipos de contrato. De esta forma, en casos de duda, los contratos de seguros se continúan interpretando de forma favorable al asegurado, mientras que los contratos de indemnización se interpretan en contra de la liberación de responsabilidad. Véanse S.L.G. Francis-Acevedo v. SIMED, 176 DPR 372, 386 (2009); Cabrera v. Doval, supra, pág. 781. No obstante, reiteramos que la obligación de defender es independiente del deber de indemnizar.

acuerden las partes. Bainville v. Hess Oil V.I. Corp., 837 F.2d 128, 130-131 (3er Cir. 1988).

Por ello, al momento de evaluar una cláusula de "hold harmless", es imperativo examinar en detalle los términos y condiciones pactados. En aquellos casos en donde la intención de las partes surja claramente de los términos del acuerdo, "los tribunales la aplicarán a menos que sean contrarias al interés público". Torres Solís et al. v. A.E.E. et als., supra. Véanse, además, el Art. 1248 del Código Civil, 31 LPRA sec. 3471 y Marcial v. Tomé, 144 DPR 522 (1997). En cambio, cuando no sea posible determinar la intención de las partes de una lectura de los términos pactados, será necesario recurrir a las normas dispuestas en el Art. 1234 del Código Civil, 31 LPRA sec. 3472. Estas permiten juzgar la intención de las partes por sus actos anteriores, coetáneos y posteriores al perfeccionamiento del contrato. En esta misma línea, hemos expresado que al interpretar los contratos "es preciso presuponer lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual [;] no se puede buscar oscuridad ni tergiversar la interpretación de contratos para llegar a resultados absurdos o injustos". S.L.G. Irizarry v S.L.G. García, 155 DPR 713, 726 (2001).

Por otro lado, en materia de acuerdos de liberación de responsabilidad en el "common law" estadounidense, el incumplimiento con la obligación de defender o proveer

representación legal da lugar a una acción por incumplimiento de contrato en la que se solicita el reembolso de los gastos y honorarios de abogado en los que tuvo que incurrir la parte afectada. Crawford v. Weather Shield Mfg. Inc., supra, págs. 557-558. Esto es consistente con lo dispuesto en el Art. 1054 del Código Civil de Puerto Rico, 31 LPRA sec. 3018, el cual establece que "[q]uedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia, morosidad, y los que de cualquier modo contravinieren al tener de aquéllas".

B.

En este caso, Posadas plantea que la obligación de Ray de defenderle se activó tan pronto la señora Burgos López presentó su demanda por daños y perjuicios. Debido a la negativa de Ray a cumplir con esta obligación, Posadas solicita que se le ordene pagarle por todos los gastos y honorarios de abogado en los que tuvo que incurrir para defenderse de esta demanda. Por su parte, Ray argumenta que sus obligaciones no se activan hasta que se resuelva la demanda subyacente y se determine que los hechos alegados en esta surgen, en efecto, de sus actos intencionales, negligentes, errores, omisiones o fallas en su desempeño. Resolvemos que el planteamiento de Posadas es el correcto.

En lo pertinente, la cláusula en cuestión establece que: "[Ray] shall defend, indemnify, and hold harmless [Posadas] [...] for all claims [...] that arise as result, in whole or in part, of the [...] negligence [...] by [Ray]". De lo anterior se desprende que esta cláusula en realidad contiene varias obligaciones, a saber, proveer representación legal o defender ("defend"), indemnizar ("indemnify") y liberar de responsabilidad ("hold harmless"). Cada una de estas obligaciones es independiente de la otra, aunque debido a la naturaleza del acuerdo, están inherentemente relacionadas. Dado que en el caso de autos la reclamación de Posadas se centra esencialmente en la obligación de defender, es en esta en que concentramos nuestra discusión.

Adviértase que la cláusula es clara en cuanto a que solo sujeta el deber de defender de Ray a que exista una demanda o reclamación ("claim") que surja o se origine como resultado ("that arise as result"), total o parcialmente, de su negligencia (entre otras causas). En otras palabras, del texto pactado se desprende que la intención de las partes fue que la obligación de Ray de defender se activara al momento de presentarse una demanda o reclamación donde el demandante alegara que el daño sufrido fue ocasionado, total o parcialmente, por la negligencia de Ray.

El término "claim" ha sido definido como "el conjunto de hechos que dan lugar a un derecho que se puede hacer

cumplir por un tribunal". (Traducción nuestra) CLAIM, Black's Law Dictionary (9th ed. 2009). En este caso, no hay duda de que la demanda de la señora Burgos López y su esposo es una reclamación para fines de la cláusula en controversia, puesto que la misma adujo una causa de acción de daños y perjuicios para que se le indemnizara por los daños sufridos como consecuencia de la caída en el hotel.

Además, un examen de la demanda demuestra que esta contiene alegaciones de negligencia en contra de Ray. Específicamente, en las alegaciones número dieciocho y veinte de la demanda enmendada se planteó que Ray fue responsable del diseño y construcción defectuosa del área donde ocurrió el incidente alegado, al crear un escalón o bajada imperceptible a la vista, y no tomar providencias ante el riesgo creado. Apéndice, págs. 132-133.

Por lo tanto, basado en el texto pactado por las partes, en nuestros precedentes en materia de contratos de seguro relacionados al deber de defender y en los desarrollos jurisprudenciales del "common law" estadounidense en este campo, los cuales incorporamos a nuestro ordenamiento por entender que son acertados, adecuados y cónsonos con nuestro sistema, resolvemos que la obligación de Ray de defender a Posadas surgió desde el momento en que la señora Burgos López presentó su reclamación. Avalar una interpretación contraria, según propone Ray, obligaría a las partes a entrar en un litigio

innecesario para dirimir un asunto que fue previsto y para el que precisamente se pactó la obligación de defender en la cláusula de "hold harmless".

Más aún, condicionar la obligación de defender en este caso a que primero recaiga una sentencia que resuelva la reclamación en los méritos sería un contrasentido e inutilizaría la obligación, pues en ese entonces ya no habría ninguna reclamación que defender. Esto tendría el efecto de desvirtuar la naturaleza de la obligación de defender y convertirla en una mera acción de reembolso por los gastos en los que incurra el principal para defenderse. Eso no es lo que surge del contrato.

III

A.

La sentencia sumaria es un mecanismo procesal que permite resolver controversias en casos donde no es necesaria la celebración de un juicio. Ramos Pérez v. Univisión, 178 DPR 200, 213 (2010). Hemos reiterado que este mecanismo "facilita la solución justa, rápida y económica de los litigios civiles cuando estos no presentan controversias genuinas de hechos materiales". Íd., pág. 214. Para "determinar si existen controversias de hechos que impiden dictar una sentencia sumaria, el tribunal debe analizar los documentos que acompañan la solicitud de sentencia sumaria y los documentos incluidos con la moción de oposición, así como los que obren en el expediente del tribunal". Íd., pág. 216. Véase, además, la

Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V. Igualmente, la Regla 36.3 (c) de Procedimiento Civil, supra, establece que una vez presentada una moción de sentencia sumaria, "la parte contraria [...] estará obligada a contestar en forma tan detallada y específica, como lo haya hecho la parte promovente. De no hacerlo así, se dictará la sentencia sumaria en su contra si procede". Véase, además, SLG Zapata-Rivera v. J.F. Montalvo, 189 DPR 414 (2013).

En esta misma línea, hemos expresado que "para que proceda una moción de sentencia sumaria no solo se requiere la inexistencia de hechos en controversia, sino que la sentencia tiene que proceder conforme al derecho sustantivo aplicable". Ortiz v. Holsum, Op. de 7 de marzo de 2014, 2014 TSPR 35, 2014 JTS 44, 190 DPR ___ (2014).

B.

En este caso, el foro primario debía resolver si a la luz de la cláusula en cuestión y de las alegaciones en la demanda de la señora Burgos López se activaba la obligación de Ray de defender o proveer representación legal a Posadas. De contestar en la afirmativa, entonces procedía determinar si Ray incumplió con esa obligación.

El texto del contrato suscrito entre Posadas y Ray fue estipulado por las partes. De igual forma, es un hecho incontrovertido que el 7 de enero de 2009, los esposos Burgos-Mercado presentaron una demanda en contra de Posadas y Ray. Como discutimos previamente, en esa demanda

se alegó que la caída que sufrió la señora Burgos López fue, en parte, como consecuencia de la negligencia de Ray. Por lo tanto, no abusó de su discreción el foro primario al resolver mediante sentencia sumaria que a la luz de la cláusula de "hold harmless" el deber de defender de Ray se activó con la presentación de la reclamación de la señora Burgos López.

Por otro lado, conforme a las cartas estipuladas por las partes en corte abierta, una vez Posadas notificó a Ray del incidente de la señora Burgos López y le requirió que cumpliera con su obligación de defenderlo de esa reclamación, Ray se negó a hacerlo y condicionó el cumplimiento de este deber a que primero se probara que hubo negligencia. Ray reiteró esta postura en el informe sobre conferencia con antelación al juicio. Apéndice, pág. 150. Por lo tanto, resolvemos que actuó correctamente el Tribunal de Primera Instancia al determinar que no existía controversia de hechos materiales sobre este asunto y resolver mediante sentencia sumaria que Ray incumplió con su obligación de defender. La evidencia en el expediente así lo sustentaba.

Finalmente, es menester que nos expresemos sobre el planteamiento de Ray en cuanto a que el monto de los gastos y honorarios de abogado que solicita Posadas es irrazonable. De un estudio del expediente se desprende que Posadas incluyó en su moción de sentencia sumaria una declaración jurada del licenciado Colón Pagán en la que

certifica la cantidad facturada por servicios legales prestados a Posadas en el caso de autos, así como copia de las facturas y cheques pagados por esos servicios. Apéndice, págs. 557-633. Ray, por su parte, se cruzó de brazos y no se opuso ni controvirtió ese hecho, por lo que el Tribunal de Primera Instancia correctamente lo dio por incontrovertido y admitido.

Si Ray entendía que la cantidad presentada por Posadas por ese concepto era irrazonable, el momento de oponerse era durante los procedimientos ante el foro primario mediante una moción en oposición a la solicitud de sentencia sumaria de Posadas; no era a nivel apelativo. Es norma conocida que "las partes no [. . .] pueden esbozar teorías nuevas o esgrimir asuntos nuevos por primera vez ante el foro apelativo". Vera v. Dr. Bravo, 161 DPR 308, 335 (2004). Es por esto que el Tribunal de Primera Instancia actuó correctamente al incluir como hecho incontrovertido en la sentencia sumaria el monto de $59,880.67 por concepto de los gastos y honorarios de abogado pagados por Posadas hasta ese momento.

Igualmente, nos parece sumamente acomodaticia la posición de Ray al alegar ante el Tribunal de Apelaciones por primera vez que en este caso no procede la sentencia sumaria dado que existen controversias sobre hechos materiales. Esta postura es sorprendente, pues fue Ray quien primero presentó una moción de sentencia sumaria en la que planteó que por no existir controversias de hechos

y solo restar por dilucidarse asuntos "de carácter puramente contractual, interpretación de cláusulas, planteamientos de estricto derecho", procedía que se dictara sentencia sumaria a su favor. Apéndice, págs. 166-175. No podemos avalar que un litigante cambie su postura ante el foro intermedio, sin explicación alguna, para entonces plantear por primera vez que existen hechos materiales en controversia que hasta entonces se entendía que no existían. Ello constituye un abuso del proceso que no podemos permitir.

IV.

Por todo lo antes expuesto, revocamos al Tribunal de Apelaciones y reinstalamos la sentencia del Tribunal de Primera Instancia, Sala de Superior de San Juan. Además, devolvemos el caso a ese foro para que determine el monto pagado por Posadas por concepto de representación legal desde el momento en que el foro de instancia dictó sentencia hasta el presente y ordene a Ray reembolsar a Posadas esa cantidad.

Rafael L. Martínez Torres<br>Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

María Burgos López, et al

     Recurridos

        v.

LXR/Condado Plaza Hotel & Casino, et al       AC-2013-0086

     Peticionarios

Ray Engineers, P.S.C.

     Recurridos

SENTENCIA

En San Juan, Puerto Rico, a 5 de mayo de 2015.

Por los fundamentos expuestos, en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, revocamos al Tribunal de Apelaciones y reinstalamos la sentencia del Tribunal de Primera Instancia, Sala de Superior de San Juan. Además, devolvemos el caso a ese foro para que determine el monto pagado por Posadas por concepto de representación legal desde el momento en que el foro de instancia dictó sentencia hasta el presente y ordene a Ray reembolsar a Posadas esa cantidad.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo. La Jueza Presidenta señora Fiol Matta emitió una Opinión concurrente. La Juez Asociada señora Rodríguez Rodríguez concurre sin opinión escrita.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

María Burgos López, *et al.*

　　　　Recurridos

　　　　　v.

　　　　　　　　　　　　　　　AC-2013-0086

LXR/Condado Plaza Hotel &
Casino, *et al.*
　　　　Peticionarios

　　Ray Engineers, P.S.C.
　　　　Recurridos

Opinión Concurrente emitida por la Jueza Presidenta SEÑORA FIOL MATTA

En San Juan, Puerto Rico, a 5 de mayo de 2015.

Concurro con la mayoría de este Tribunal porque surge diáfanamente del contrato que firmaron las partes que la obligación de indemnizar[1] y mantener indemne[2] que asumió la parte recurrida, Ray Engineers, P.S.C. (Ray Engineers) hacia Posadas de Puerto Rico Associates, L.L.C. h/n/c Condado Plaza Hotel (Posadas) incluye la obligación de asumir la representación legal de esta en reclamaciones relacionadas a los trabajos de remodelación

_____

[1] Indemnizar significa "resarcir de un daño o perjuicio". Diccionario de la Lengua Española, Real Academia Española, 22da Edición, 2001

[2] La palabra "indemne" significa libre o exento de daño. *Íd.*

y mejoras para los cuales se contrató a Ray Engineers. Por esta razón, la controversia en este caso reviste una naturaleza enteramente contractual que puede ser atendida sin recurrir a ninguna otra fuente de autoridad que no sea nuestro Código Civil. No puedo emitir un voto de conformidad porque el método de adjudicación utilizado en la Opinión Mayoritaria es errado. El que este tipo de cláusulas de indemnización, llamadas "hold harmless" en inglés, sean comunes en Estados Unidos, no significa que sea necesario recurrir a jurisprudencia estadounidense para resolver la controversia que se nos plantea, cuando nuestro ordenamiento provee los mecanismos adecuados para atenderla.

I.

La Opinión de la Mayoría expone correctamente los hechos de este caso. Por esta razón resumiremos muy brevemente los hechos pertinentes.

Bajo un contrato de servicios, firmado con Posadas el 21 de noviembre de 2005, Ray Engineers acordó actuar como contratista para la renovación y remodelación del Hotel Condado Plaza, propiedad de Posadas. El contrato incluyó la remodelación del área de la entrada y del vestíbulo del hotel, conocida como el "redondel" o el "porta-cochere". Ray Engineers, en su capacidad de "arquitecto de récord" del proyecto, se obligó, entre otras cosas, a: (1) preparar y certificar los planos finales arquitectónicos y

de ingeniería para el área del redondel; (2) incluir en los planos arquitectónicos la preparación, tratamiento y terminación de todas las superficies, incluyendo los pisos y las elevaciones; (3) asegurarse que todos sus diseños, documentos y servicios cumplieran con las leyes y reglamentos locales y federales; (4) revisar los dibujos del contratista para verificar que cumplieran con las especificaciones preparadas por el arquitecto (Ray Engineers), y (5) observar el proceso de construcción e informar de cualquier desviación del contratista respecto a los planos y el contrato de remodelación o de las normas de buena práctica en la construcción.[2]

Junto a todas estas obligaciones, Ray Engineers suscribió una cláusula de indemnidad o "*hold harmless agreement*". Esta cláusula, contemplada en la sección 12.2.3.1 del contrato, señala textualmente lo siguiente:

> The Architect [Ray Engineers] shall defend,[3] indemnify and hold harmless the Owner [Posadas], Owner´s Lender, Owner´s affiliated companies, Owner´s consultants and their respective officers, directors, employees and agents (the "Indemnitees"), for all claims, damages, losses, fees, expenses and costs (including but not limited to legal fees and expenses, and court mediation, and arbitration costs) that arise as a result, in whole or in part, of the intentional acts, negligence, errors, omissions, or failure to perform by the Architect, its employees, its agents, or its Consultants except for that portion of such damages, losses, fees, expenses and costs that are caused solely by the

---

[2] Apéndice, págs. 24 – 29.

[3] La palabra inglesa "*defend*" es traducida por "defender, proteger". SMART Diccionario Español – Inglés, Grupo Editorial Océano, 1992.

negligence of Owner.[4]

El 5 de enero de 2008 la señora María Burgos López sufrió una caída en la entrada del vestíbulo del Hotel Condado Plaza, que fue remodelado por Ray Engineers. Se alegó en la demanda que la caída ocurrió cuando la señora Brugos López perdió el balance por motivo del encintado que se había utilizado durante los trabajos de remodelación. Esto provocó que la bajada o escalón fuera totalmente imperceptible ya que no se habían utilizado colores distintos ni había ninguna otra indicación que ayudara a detectar su existencia.

La demanda contra Posadas y Ray Engineers se presentó el 7 de enero de 2009. Se incluyeron alegaciones específicas contra Ray Engineers por negligencia en su intervención directa en el diseño y/o por la construcción defectuosa del área donde tuvo lugar el accidente que, según se alega, creó una condición peligrosa que puso en riesgo la seguridad de los visitantes y clientes del Hotel Condado Plaza. Antes de presentarse la demanda, la señora Burgos López envió una carta, el 4 de abril de 2008, en la cual le reclamó a Posadas una indemnización por los daños provocados por la caída que sufrió en los predios del Hotel Condado Plaza. Posadas, confiando en el texto de la cláusula pactada, envió una carta a Ray Engineers el 7 de octubre de 2008 solicitándole que diera cumplimiento estricto a lo pactado en la cláusula de indemnidad, y

---

[4] *Ver*, Alegato de Posadas, pág. 10.

procediera a defender a Posadas ante la reclamación de la señora Burgos López. El 7 de enero de 2009, el mismo día en que se presentó la demanda, Ray Engineers contestó la misiva negándose a defender a Posadas. Luego de ser emplazada el 14 de enero de 2009, Posadas insistió en que Ray Engineers la defendiera de la reclamación y le envió una nueva carta, junto con copia de la demanda, para que la representara legalmente en el proceso. Nuevamente Ray Engineers se negó y alegó que para que se activara la cláusula de indemnidad, era necesario demostrar primero su negligencia.

## II.

## A.

La Opinión Mayoritaria reconoce que nos encontramos ante una controversia de índole contractual. Expresa incluso que en el pasado este Tribunal ha validado acuerdos y cláusulas de indemnización o liberación de responsabilidad, conocidas como "hold harmless agreements" o "indemnity clauses".[5] Además, la Opinión Mayoritaria hace un reconocimiento de la naturaleza mixta del derecho en nuestra jurisdicción, advirtiendo la necesidad de actuar cuidadosamente al analizar y adoptar normas del "common law" en nuestro ordenamiento legal de manera que no terminemos desnaturalizando los principios civilistas que

---

[5] Opinión Mayoritaria, pág. 8. Citando a Natal Cruz v. Santiago Negrón, 188 DPR 564, 584 – 585 (2013) y Torres Solís et al. v. A.E.E. et als., 136 DPR 302, 314 (1994).

rigen en muchas de sus materias.[6] Sin embargo, acto seguido afirma que en el presente caso resulta imperioso servirse del desarrollo de la doctrina y jurisprudencia del "*common law*" para interpretar y estudiar la obligación de defender dentro del contexto de la industria de la construcción.[7] Esta acción se justifica en que, según señala la Opinión, estos contratos tienen cláusulas adoptadas de contratos modelos preparados por organizaciones profesionales de la industria de la construcción en Estados Unidos. Después de este análisis, la Mayoría de este Tribunal concluye que en este caso es válido incorporar los desarrollos estadounidenses en torno a las cláusulas de indemnización en los contratos de construcción, "por entender que son acertados, adecuados y cónsonos con nuestro sistema".[8]

Este análisis metodológico, que toma prestadas innecesariamente las soluciones o los fundamentos que ofrece el derecho común anglosajón o *common law* por entender que el derecho puertorriqueño no provee una solución específica al problema,[9] se aleja de lo que debe

---

[6] Opinión Mayoritaria, pág. 11.

[7] Íd.

[8] *Íd.*, pág. 19

[9] La Opinión Mayoritaria pone mucho énfasis en que es necesario recurrir a la jurisprudencia estadounidense porque en Puerto Rico no contamos con una solución específica para el problema que presenta la controversia en este caso. Sin embargo, eso no significa que no podemos derivar una solución justa utilizando las normas de nuestro Código Civil. El método de razonamiento dentro de nuestra tradición civilista se sustenta precisamente en

ser la mejor práctica en nuestra jurisdicción en la cual, cómo todos conocemos y reconoce la Opinión mayoritaria, convergen las tradiciones jurídicas del derecho civil y el *common law*.[10] El método utilizado por la Opinión Mayoritaria busca apoyo innecesariamente en jurisprudencia estatal y federal estadounidense para resolver una controversia adscrita al campo de las obligaciones y los contratos y, por lo tanto, perteneciente a nuestra tradición civilista. Esto es un reflejo de lo que el jurista español José Puig Brutau llamó el "curioso fenómeno del doble razonamiento".[11] Según Puig Brutau, este fenómeno se manifiesta en la necesidad que creen tener los tribunales puertorriqueños, incluido este Tribunal, de justificar sus conclusiones según los conceptos y doctrinas de ambos sistemas legales.[12] Este doble razonamiento crea confusión en los actores legales que deben interpretar y aplicar el derecho puertorriqueño,

---

obtener, de normas generales, respuestas para atender controversias específicas.

[10] José Trías Monge, El Choque de dos culturas jurídicas en Puerto Rico, Equity, 1991. Tal y como señalamos en Valle v. American International Insurance Co., et als, 108 DPR 692, 697 (1979) "[e]n los casos apropiados será lícito el empleo del derecho común en sus múltiples y ricas versiones —la angloamericana, la original británica, la anglocanadiense y otras— a modo de derecho comparado, así como el uso de ejemplos de otros sistemas jurídicos".

[11] Liana Fiol Matta, Civil Law and Common Law in the Legal Method of Puerto Rico, 40 Am. J. of Comp. L. 783, 792 (1992), citando a José Puig Brutau, La acción recíproca del Derecho español y del Derecho norteamericano en Puerto Rico, 44 Rev. Der. P. 499, 503 – 505 (1972).

[12] *Íd*.

dando la falsa impresión de que la Ley no es suficiente para validar una determinación judicial sino que es necesario el respaldo de la jurisprudencia del lugar de origen de la norma.

No se trata de sentir aversión por la introducción en nuestro derecho de elementos de otros sistemas jurídicos o de insistir en un purismo civilista que sea estéril e impida el desarrollo del derecho puertorriqueño. Por el contrario, los préstamos jurídicos representan un aspecto familiar de las culturas jurídicas modernas.[13] Por esta razón, "[l]os contornos originales de la figura en el país nativo afectan naturalmente su sentido en el país prestatario, pero a fin de cuentas es la cultura de éste, las circunstancias del medio en que se inserta la figura, las que definirán su significado y su rumbo."[14] Así, el recurso al préstamo jurídico es válido y resulta una herramienta útil cuando las circunstancias del caso lo ameritan. Lo que no es lícito es la idea, durante tanto tiempo alimentada por opiniones poco agraciadas de este Tribunal, que si adoptamos una institución o concepto del derecho común anglosajón —en su versión estadounidense— estamos obligados por la interpretación que los tribunales de dicho país hayan dado a la misma, sin que se permita que nuestras condiciones particulares le impriman perfil

---

[13] Trías Monge, op. cit., §5.9, pág. 126.

[14] Íd.

propio.[15] En tiempos pasados este Tribunal facilitó el proceso de desvirtuar nuestro derecho civil, entremezclándolo y confundiéndolo con el derecho común angloamericano al adoptar innecesariamente doctrinas, figuras o normas de dicha tradición jurídica. Estos tiempos de asimilación y, en palabras del Lcdo. José Trías Monge, de "embobamiento colonial", ya superados, tuvieron la consecuencia de cambiar el significado de nuestros códigos y leyes, desmereciendo el desarrollo del derecho autóctono puertorriqueño.[16] Tal y como señaló en una ocasión el otrora Juez Asociado de este Tribunal, José Benjamín Ortíz Ortíz: "[d]ebemos estudiar los sistemas legales extranjeros desde el punto de vista de nuestro propio ambiente. Debemos crear, transformar, establecer nuevos principios y nuevos métodos jurídicos que se adapten a nuestro puertorriqueñismo sin que ello implique que debamos rechazar la influencia de sistemas foráneos de derecho...".[17]

La técnica de derecho comparado que utiliza la Opinión Mayoritaria es una alternativa que, ante un caso adecuado, podemos emplear para servirnos del derecho común angloamericano.[18] Nos ayuda en la medida en que nos muestra

---

[15] Íd.

[16] Íd., §5.2, pág. 108.

[17] Benjamín Ortíz, El Derecho como vehículo de expresión de nuestra cultura, 5 Rev. Leg. y Jur. Asoc. Abo., 133, 136 – 37 (1940).

[18] Trías Monge, op. cit., § 13, pág. 409.

cómo otros ordenamientos han atendido distintos problemas, pero contrario al uso que le da la Opinión Mayoritaria, no debe suplantar los entendidos y preceptos de nuestro derecho civil.[19] Sin embargo, es importante señalar que en el caso de epígrafe realmente no hay una ley, figura jurídica o institución de derecho común angloamericano que se haya adoptado en nuestra jurisdicción. El hecho que señala hoy la Mayoría de que el contrato en controversia tiene un lenguaje modelo según preparado por la industria de la construcción de Estados Unidos no es suficiente para adoptar interpretaciones de tribunales estadounidenses sobre su significado y alcance. Eso sería suponer que nuestros tribunales están obligados a interpretar contratos que se realicen en Puerto Rico, y a los que aplica por supuesto nuestro Código Civil, utilizando metodologías extrañas a nuestro ordenamiento por el simple hecho de que se tomó como ejemplo el lenguaje utilizado en determinada jurisdicción o industria. Por supuesto que es válido el ejercicio, como derecho comparado, de examinar el modo en que los tribunales estadounidenses interpretan obligaciones contractuales como las del presente caso. Lo que no es necesario ni aceptable es adoptar sus soluciones por esa sola razón, sobre todo cuando nuestro ordenamiento provee para desarrollar una norma propia que haga justicia a las partes. En el caso de epígrafe, nos encontramos ante un pacto entre dos individuos, realizado en Puerto Rico y

---

[19] Íd.

sujeto a las normas legales dispuestas por nuestro Código Civil en materia de obligaciones contractuales. Además, el temor de la Mayoría de que interpretemos la cláusula en controversia utilizando nuestras normas generales de derecho contractual y buena fe parecen ser infundadas. Esto, ante la contundente realidad de que la obligación de defender dentro del contexto de la controversia de epígrafe, no tiene un significado distinto o particular a lo que se entiende generalmente por defensa legal en otros contextos. Siendo esto así, es aún más patente lo innecesario que resulta recurrir a soluciones foráneas para resolver una controversia para la cual nuestro sistema civilista provee una respuesta justa.

B.

El Código Civil de Puerto Rico regula en su Libro IV, sobre las obligaciones y los contratos, las relaciones que se establecieron entre Posadas y Ray Engineers con la firma del contrato de 21 de noviembre de 2005. Nuestro Código Civil parte de una metodología que se sustenta en la interpretación de normas mediante la analogía, la deducción lógica de soluciones específicas a partir de normas y conceptos generales, y la utilización de principios generales de derecho. De estos recursos deben echar mano los tribunales puertorriqueños al resolver controversias de carácter civil, recurriendo al préstamo jurídico únicamente en casos en que la ley, figura o

institución jurídica haya sido importada.[20] Como ya vimos, aún en estos casos se debe ejercer la prudencia y buscar la manera de adecuar éstas figuras y normas foráneas a las condiciones, realidades y normas de nuestro sistema jurídico.

Tal y como señaló Posadas en su alegato, el Artículo 1044 del Código Civil establece que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes y deben cumplirse al tenor de los mismos.[21] Además, nuestro Código Civil dispone que para que exista un contrato deben concurrir el consentimiento de las partes, objeto cierto que sea materia del contrato y la causa de la obligación.[22] Por otro lado, para que los contratos sean válidos, sus cláusulas no pueden ser contrarias a la ley, la moral y el orden público.[23]

Sin embargo, la controversia de este caso no gira en torno a la existencia del contrato pactado.[24] Lo que está en controversia es la interpretación de la cláusula de indemnización e indemnidad o "*hold harmless*" que se firmó como parte del contrato de 21 de noviembre de 2005. Posadas argumenta que, a tenor con la primera oración de

---

[20] Claro está, esto no impide recurrir a fuentes de Derecho Comparado para propósitos de interpretación y elaboración del derecho propio.

[21] 31 LPRA sec. 2994.

[22] 31 LPRA sec. 3391.

[23] 31 LPRA sec. 3372.

[24] Como cuestión de hecho, las partes estipularon la existencia del contrato.

la cláusula, Ray Engineers está obligado a "defender, indemnizar y mantener libre de daños [indemne]" a Posadas, sus oficiales, agentes y consultores, de "toda reclamación, daños, pérdidas, cuotas, pagos y costos". Ello incluye, pero no está limitado a gastos y costas legales que sean el resultado en todo o en parte de los actos intencionales, negligencia, errores u omisiones de Ray Engineers,[25] desde la presentación de una demanda en su contra que guarde relación a los trabajos de mejoras y remodelación. Por otro lado, Ray Engineers se negó a defender a Posadas y argumentó, a tenor con el lenguaje de la propia cláusula, en su parte final, que primero debía demostrarse que Ray Engineers incurrió en actos intencionales, negligencia, errores u omisiones que provocaron los daños alegados. Como se puede apreciar, tenemos dos interpretaciones distintas del mismo texto contractual.

Para resolver esta controversia debemos analizar las normas de nuestro Código Civil en materia de interpretación de los contratos. Comenzamos con la primera oración del Artículo 1233 del Código Civil: "Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas."[26] Ese mismo artículo nos aclara

---

[25] Cláusula 12.2.3.1 del Contrato de 21 de noviembre de 2005. Apéndice, pág. 151. (Traducción nuestra).

[26] 31 LPRA sec. 3471.

que si las palabras del contrato fueran contrarias a la intención de las partes esta debe prevalecer.[27] Además, la intención de las partes debe juzgarse atendiendo a los actos de las partes que sean coetáneos y posteriores al contrato.[28]

El Código Civil también establece una serie de normas para interpretar cláusulas con diversos sentidos, y palabras que tengan distintos significados. A esos efectos dispone que cualquiera que sea la generalidad de los términos usados en un contrato, no deben entenderse comprendidos en el mismo cosas distintas a aquéllas sobre las que las partes se propusieron contratar.[29] Además, si alguna cláusula admite diversos sentidos o significados, deberá observarse el más adecuado para que ésta surta el efecto que las partes acordaron.[30] Por último, si una misma palabra tiene diversas acepciones o significados, se debe utilizar el significado que sea más satisfactorio dada la naturaleza y objeto del contrato.[31]

---

[27] *Íd.*

[28] 31 LPRA sec. 3472.

[29] 31 LPRA sec. 3473.

[30] 31 LPRA sec. 3474.

[31] 31 LPRA sec. 3476.

C.

Además de las normas sobre la interpretación y validez de los contratos que hemos expuesto, para resolver esta controversia contractual debemos prestar atención a la norma firmemente establecida en nuestro derecho según la cual las partes están obligadas por la buena fe en la negociación, perfeccionamiento y cumplimiento de sus obligaciones contractuales. Nuestro Código Civil incorpora este principio general de derecho al disponer que las partes se obligan, desde el perfeccionamiento de los contratos, "no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley".[32]  Sobre este precepto, el profesor Michel Godreau Robles explica que se trata, no tanto del estado mental de las partes contratantes, sino de sus actuaciones. Así, los actos de las partes se deben evaluar a la luz de un criterio o de un estándar normativo, independientemente de que los contratantes, de hecho, crean o no que están actuando correctamente.[33] Se trata de la llamada buena fe objetiva, que es la que más se ha asociado al campo del cumplimiento contractual.[34] Por otro lado, el tratadista Díez-Picazo define la buena fe contractual como "la

---

[32] 31 LPRA sec. 3375.

[33] Michel Godreau Robles, Lealtad y Buena Fe Contractual, 58 Rev. Jur. UPR 367, 372 (1989).

[34] Íd.

lealtad en el tratar, el proceder honrado y leal. Supone

el guardar la fidelidad a la palabra dada y no defraudar

la confianza, ni abusar de ella; supone un conducirse como

cabe esperar de cuantos, con pensamiento honrado,

intervienen en el tráfico como contratantes".[35] En

Producciones Tommy Muñiz v. COPAN, este Tribunal expresó:

> La buena fe... impone a las partes que
> tratan o negocian un arquetipo de conducta
> social, lealtad y fidelidad a la palabra dada...
> y consiste en que cada parte de la relación
> precontractual se entregue confiadamente a la
> conducta leal de la otra. Fía y confía en que
> ésta no le engañará... Las partes tienen la
> obligación de comportarse según la buena fe en
> el sentido de que a ella incumbe la carga de una
> **lealtad recíproca** de conducta valorable y
> exigible.[36]

Ahora bien, para identificar lo que debe ser el

comportamiento de las partes para cumplir con el deber de

buena fe en materia de las obligaciones contractuales, se

tiene que analizar el asunto a la luz de la propia

naturaleza de la relación contractual y de los valores e

---

[35] *Íd.*, pág. 374, citando a L. Díez-Picazo, La doctrina de los propios actos 157 (Barcelona, Bosch 1963). Véase, International General Electric v. Concrete Builders, 104 DPR 871, 875 (1976) en la nota 4.

[36] Producciones Tommy Muñiz v. COPAN, 113 DPR 517, 528 (1982) (Énfasis añadido). Además en Ramírez v. Club Cala de Palmas expresamos que "[e]l requisito de buena fe es elemental y, como tal, se extiende a la totalidad de nuestro ordenamiento jurídico. ¨El contenido de eticidad de cada acto deberá examinarse a la luz de sus circunstancias particulares, pero el comportamiento conforme a la buena fe es precepto general que abarca toda actividad jurídica¨". 123 DPR 339, 346 (1989), citando a Catalityc Ind. Mant. Co. v. F.S.E., 121 DPR 98, 113 (1988); y Velilla v. Pueblo Supermarkets Inc., 111 DPR 585, 587 – 588 (1981).

intereses que deben protegerse en dicha relación.[37] Como el contrato es el producto de una relación voluntaria entre las partes, en virtud de la cual un contratante persuade al otro a través de promesas que generan expectativas, el interés que se busca proteger al exigir que las partes observen el principio de la buena fe es el deber de actuar de manera leal.[38] Así, el conocimiento de las expectativas legítimas que generaron los actos de los contratantes es lo que justifica que se imponga el deber de actuar de manera leal: "Ausente dicho conocimiento, la forma de comportarse de una persona frente a otra podrá regirse por principios éticos basados en la exigencia de actuar correctamente, pero ello no requerirá necesariamente el tipo de comportamiento que encarna el valor superior de lealtad".[39]

Según Godreau Robles, el deber de lealtad que busca proteger el concepto de la buena fe en materia contractual puede implicar un comportamiento que va más allá del mero actuar correcta u honestamente y en ocasiones puede rebasar incluso el marco de la realización de la prestación.[40] Por último, no debe quedar ninguna duda que

---

[37] Godreau Robles, *supra*, pág. 379.

[38] *Íd.*, pág. 380.

[39] *Íd.*

[40] *Íd.* Godreau Robles señala que el deber de actuar lealmente podría significar que, incluso en casos en que el incumplimiento pueda estar justificado por haber quedado liberado el deudor —como en el caso en que la imposibilidad de cumplir la obligación haya sido causada

la obligación de observar el principio de la buena fe existe no sólo en la fase de negociación y perfeccionamiento del contrato, sino también en el desenvolvimiento y cumplimiento de las obligaciones pactadas. Así lo expresa el tratadista Díez—Picazo al establecer que las partes "deben adoptar un comportamiento leal en toda la fase previa a la constitución de tales relaciones; y que deben también comportarse lealmente en el desenvolvimiento de las relaciones jurídicas ya constituidas entre ellas".[41]

La obligación de actuar de buena fe en el cumplimiento de las obligaciones se recoge en los códigos civiles de otros países que comparten nuestra tradición civilista en materia contractual. Así, el Artículo 1258 del Código Civil español, al igual que nuestro Artículo 1210, establece que las partes están obligadas no sólo al cumplimiento de lo expresamente pactado, sino también a todas las demás consecuencias que sean conformes a la buena fe según la naturaleza de la obligación. El Código Civil suizo de 1907, aún vigente con enmiendas, dispone en su Artículo 2, primera oración, que se requiere a todos ejercer sus derechos y cumplir sus obligaciones de acuerdo

---

por caso fortuito- el principio de la buena fe podría imponer la responsabilidad si no se atienden las expectativas de la otra parte, como por ejemplo, que se le avise oportunamente del incumplimiento de manera que se puedan evitar daños mayores.

[41] Díez-Picazo, op. cit., pág. 12.

con las normas de la buena fe.[42] De igual forma el Artículo 1366 del Código Civil italiano expresa que: "[e]l contrato debe ser interpretado según la buena fe"[43] y en su Artículo 1375 dispone que el contrato debe cumplirse según las normas de la buena fe.[44] El Tribunal de Casación italiano ha establecido en su doctrina legal – *Giurisprudenza*- que el recurso a la buena fe contractual tiene como base un criterio objetivo, fundamentado en el criterio de la lealtad recíproca en la conducta de las partes, protegiendo la confianza que cualquiera de las partes coloca en el significado de las declaraciones de la otra.[45] Así, cuando persiste una duda sobre el significado real de una declaración contractual, se debe recurrir a interpretarlo según las normas de la buena fe.[46] Además, la doctrina legal italiana reconoce que la buena fe es un

---

[42] Code civil suisse du 10 décembre 1907, Titre préliminaire, Art. 2: "*Chacun est tenu d'exercer ses droits et d'exécuter ses obligations selon les règles de la bonne foi. L'abus manifeste d'un droit n'est pas protégé par la loi.*" Disponible en http://www.admin.ch/opc/fr/classifiedcompilation/19070042/201407010000/210.pdf, última visita el 7 de abril de 2015.

[43] "*Interpretazione di buona fede – Il contratto deve essere interpretato secondo buena fede*". Articolo 1366, Codice Civile italiano. Vittorio De Martino, Codice Civile, Commentato con la Giurisprudenza, Jandi Sapi Editori, 1983. (Traducción nuestra).

[44] "*Esecuzione di buona fede – Il contratto deve essere eseguito secondo buona fede*". Articolo 1375, Codice Civile italiano. De Martino, op.cit., pág. 1882.

[45] *Íd.*, pág. 1870, dicutiendo a Cass. 19 dicembre 1957, n. 4756 (Giust. Civ. Mass. 1957, 1179); Conf.: Cass. 6 marzo 1969, n. 745.

[46] *Íd.*

criterio que sirve para excluir la utilización de un significado unilateral, forzado o contrastante a la confianza que la persona común puede depositar en las declaraciones del contrato.[47]

Vemos como otros ordenamientos jurídicos que comparten nuestra tradición civilista regulan de modo análogo al nuestro las obligaciones que la buena fe impone a los contratantes al momento de perfeccionar y cumplir sus obligaciones contractuales. En ese sentido, y manteniendo lo anterior en mente, no podemos olvidar que nuestro Código Civil también establece que el cumplimiento de las obligaciones contractuales no puede dejarse al arbitrio de uno solo de los contratantes.[48]

III.

Las disposiciones de nuestro Código Civil que hemos repasado establecen un marco lógico y ordenado del cual podemos derivar una solución justa para la controversia planteada ante nosotros. Así, las normas de este cuerpo legal son suficientes en sí mismas para determinar las obligaciones surgidas entre Posadas y Ray Engineers y cuándo éstas se activan.

Primeramente, las partes pactaron en el contexto de la remodelación del área del redondel o "porta-cochere" del Hotel Condado Plaza, propiedad de Posadas. La remodelación

---

[47] Cass. 13 dicembre 1978, n. 5939, Giur. it., 1979, I, 1, 1294.

[48] 31 LPRA sec. 3373.

de cualquier estructura conlleva, en la mayoría de los casos, el inicio de obras de construcción en las cuales se remueven estructuras viejas y se hacen planos de las nuevas estructuras o componentes arquitectónicos que se añadirán. Como vimos, según lo expresamente pactado en el contrato de 21 de noviembre de 2005, Ray Engineers se obligó a prestar sus servicios profesionales para realizar los planos de la obra, supervisar que los trabajos se realizaran conforme a lo establecido por éstos y al estándar de buenas prácticas en la construcción. Además, Ray Engineers se obligó a escoger las terminaciones que se le darían a las superficies. La naturaleza de los servicios pactados implica la realización de unas obras de construcción, lo que conlleva el que puedan surgir situaciones peligrosas que pongan en riesgo la seguridad de las personas que utilizan las facilidades. Ante esto, es natural que el dueño de la obra pacte con el contratista o proveedor de servicios una cláusula en la cual se le garantice al dueño que se le indemnizará y/o protegerá y defenderá legalmente de cualquier demanda, reclamación, daños, o gastos que surjan como parte de los trabajos realizados, los cuáles el contratista se comprometió a realizar siguiendo los estándares aceptados por la profesión.

Como cuestión de umbral, este pacto no es contrario a ninguna ley, la moral o el orden público. Como señala la Opinión Mayoritaria, este tipo de cláusulas ya han sido

validadas en el pasado en nuestra jurisdicción. Ahora bien, en el caso de epígrafe, existe controversia en torno a si la cláusula de indemnidad pactada entre Posadas y Ray Engineers se activa en el momento en que se presentó la demanda en contra de éstos o, como sostiene Ray Engineers, una vez se determine que en efecto los daños ocurrieron por su culpa o negligencia.

El texto en el idioma inglés de la cláusula comienza diciendo que "[t]he Architect shall defend, indemnify and hold harmless the Owner...". Añade que dicha obligación se activará "...for all claims, damages, losses, fees, expenses and costs... that arise as result, in whole or in part, of the intentional acts, negligence, errors, omissions, or failure to perform by the Architect". Vemos que el texto claro de la cláusula establece categóricamente que Ray Engineers tenía la obligación de defender a Posadas ante reclamaciones judiciales relacionadas a actos, voluntarios o negligentes, del contratista. El término defender se define como "amparar, librar, proteger".[49] Sin embargo, en otra de sus acepciones, defender también significa "abogar, alegar en favor de alguien".[50] Ahora bien, acoger la interpretación propuesta por Ray Engineers y concluir que su obligación de "defender" no se activa hasta tanto se determine que,

---

[49] Diccionario de la Lengua Española, Real Academia Española, 22da Edición, 2001.

[50] Íd.

en efecto, fue negligente, restaría todo sentido a la cláusula puesto que es imposible abogar o alegar en favor de alguien una vez el proceso judicial ha terminado. Como vimos, los términos pactados en un contrato deben ser interpretados en su acepción que sea más conforme a la naturaleza y objeto del contrato y que sea el más adecuado para que produzca el efecto deseado por las partes.[51]

Por otro lado, al momento de pactar, Posadas confió en el significado de las palabras que se expresaron en el contrato y en las actuaciones posteriores de las partes. No surge del expediente del caso que, antes que la señora Burgos López demandara, Ray Engineers hubiera presentado algún reparo, objetado o intentado clarificar el texto de las obligaciones pactadas en la cláusula de protección a favor de Posadas. En este sentido, la carta que le envió Posadas a Ray Engineers el 7 de octubre de 2008, en la cual le notifica de la reclamación extrajudicial que le hizo la señora Brugos López, y la segunda carta que le envió el 26 de enero de 2009, esta vez con copia de la demanda radicada en su contra, arrojan luz sobre las intenciones de las partes al momento de pactar y la confianza que depositó Posadas en lo escrito expresamente en el contrato. Surge de estos hechos que la expectativa creada en Posadas era que Ray Engineers se encargaría de su defensa en cualquier reclamación relacionada a los trabajos de remodelación que se llevaron a cabo en el

---

[51] Artículos 1236 y 1238 del Código Civil, 31 LPRA secc. 3474 & 3476.

Hotel Condado Plaza y en los cuales intervino esa compañía. La interpretación que propone Ray Engineers exige que exista una determinación de culpa o negligencia en su contra para que las obligaciones de la cláusula se activen. Esto frustraría completamente las expectativas que de buena fe se crearon en Posadas, sobre todo ante el hecho indiscutible de que en el presente caso no hubo dicha determinación de negligencia toda vez que ambas partes transaron con la señora Burgos López y la reclamación entre Posadas y Ray Engineers se resolvió mediante sentencia sumaria.

Dado lo anterior, la interpretación de la cláusula en controversia que sugiere Ray Engineers resultaría en que, contrario a lo expresamente pactado y a las expectativas generadas en Posadas, esta tendría que asumir su defensa, los gastos, costas, y daños que tuvo que pagar a terceros por hechos en los que estaban directamente implicados los servicios que Ray Engineers se comprometió a realizar ajustándose al "buen criterio ingenieril". Este resultado es completamente contrario al deber de lealtad que le impone la buena fe a Ray Engineers y vulnera la confianza que depositó Posadas en éste. Tal actuación no es aceptable en nuestro ordenamiento. Además, implicaría dejar al arbitrio de una de las partes el cumplimiento de la obligación pactada, pues un contratante situado en la misma posición que Ray Engineers, y sujeto a la misma obligación, podría siempre transar con la parte demandante

de manera tal que el tribunal nunca hiciera una determinación final sobre su responsabilidad.

Siempre que sea consistente con la naturaleza del contrato o las obligaciones asumidas por las partes, se debe entender que la obligación de defender y mantener indemne pactada en una cláusula de indemnidad, como la de este caso, se activará en el momento que se presente una demanda en la que se alegue que los daños y perjuicios son el resultado de la culpa, negligencia, error u omisión de la parte que se obligó a indemnizar y proteger de toda reclamación a la otra parte. De esta manera, queda resguardada la confianza recíproca y las expectativas generadas en cada una de las partes contratantes. Sin embargo, hay que precisar que la obligación de defender y proteger que asume una de las partes será exigible hasta tanto surja del descubrimiento de prueba, o durante cualquier otra etapa del litigio, que los daños alegados son en realidad el resultado de la culpa o negligencia de la parte protegida. De ser este el caso, a solicitud de parte el tribunal deberá determinar si en efecto existe evidencia concreta que establezca que las defensas de la parte obligada y la parte protegida están encontradas. Esto es así porque el texto expresamente pactado y la obligación de actuar de buena fe y de manera leal entre las partes tienen como resultado que cada cual asuma los costos de su defensa y de los daños que provocó su actuación, reembolsando la parte responsable de los daños

los gastos, si algunos, que asumió la otra.[52]


                                        Liana Fiol Matta
                                        Jueza Presidenta

---

[52] En la Opinión Mayoritaria se realiza un análisis *in pari materia* con el campo de los contratos de seguros en Puerto Rico. Citando a PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 DPR 881, 896 (1994) se expresa que bajo dicho contrato de seguro, "[l]a obligación de la compañía aseguradora de asumir la representación legal surgirá cuando de una interpretación liberal de las alegaciones surja la posibilidad de que el asegurado está protegido por la póliza expedida, independientemente de cuál sea la adjudicación final del caso". *Véase*, Opinión Mayoritaria, en la pág. 10. Aunque este análisis puede ser correcto y resulta útil aplicar la misma norma a la situación que presenta este caso, hay serias limitaciones a la analogía propuesta por la Opinión mayoritaria. Por ejemplo, debemos tener cuidado de no confundir las obligaciones de una aseguradora frente a su asegurado con las obligaciones que asumieron las partes en este caso, ya que cuando el evento está contemplado en la cubierta del asegurado, la aseguradora asume su representación legal en la misma posición que el asegurado, con todas sus obligaciones y defensas hasta el monto cubierto por la póliza. Sin embargo, en el caso ante nuestra consideración, estamos ante dos partes privadas que suscribieron un contrato de servicios –no de seguros– en el que se incluyó una cláusula de indemnidad o "*hold harmless*". Según los propios términos de la cláusula, esta obligación será exigible siempre que los daños alegados hayan sido producto de la culpa o negligencia de la parte obligada a proteger a la otra. Por lo tanto, si durante el litigio se descubre que en efecto los daños alegados no fueron provocados por la parte obligada a proteger, surgiría una situación anómala, no contemplada en la relación aseguradora – asegurado, donde una parte tendría que asumir defensas encontradas. Es decir, por un lado tendría que cumplir con su obligación de defender y mantener indemne a la parte con la que se obligó, y por el otro, tendría que defenderse a sí misma de una responsabilidad que no le corresponde.